269 F.Supp.2d 1162 (2003)
Jeffrey S. AARON, as the trustee of the Sylvia H. Aaron Revocable Trust, et al., Plaintiffs,
v.
TARGET CORPORATION, et al., Defendants.
No. 4:03-CV-429 CAS.
United States District Court, E.D. Missouri, Eastern Division.
July 3, 2003.
*1165 Edward M. Goldenhersh, William J. Travis, John E. Petite, Greensfelder and Hemker, St. Louis, MO, Richard M. Goldstein, James K. Landau, Proskauer Rose, LLP, New York City, for Jeffrey S. Aaron, Adtar, LLC.
Mary M. Bonacorsi, Pamela J. Meanes, Paul T. Sonderegger, Thompson Coburn, St. Louis, MO, for Hampton Village Associates, L.L.C.
Gerard T. Carmody, Kevin M. Cushing, John E. Hilton, Kelley Field Farrell, Carmody and MacDonald, St. Louis, MO, for Target Corp.
Edward J. Hanlon, Mark Lawson, St. Louis City Counselor, St. Louis, MO, for St. Louis, Mo.
Jay L. Levitch, Henry F. Luepke, III, Stolar Partnership, St Louis, MO, for Land Clearance Redevelopment Corp. of City of St Louis.

MEMORANDUM AND ORDER
SHAW, District Judge.
This matter came before the Court for hearing on June 24, 2003, on a motion for temporary restraining order filed by plaintiffs Jeffrey S. Aaron, as the trustee of the Sylvia H. Aaron Revocable Trust (the "Trust"), ADTAR, L.L.C, ("Adtar") and Hampton Village Associates, L.L.C, successor in interest to the Estate of Louis Feil ("HVA").[1] Defendants Target Corporation ("Target"), the City of St. Louis ("City") and the Land Clearance Redevelopment Authority of the City of St. Louis ("LCRA") opposed the motion. After hearing arguments of counsel, the Court granted plaintiffs' motion and issued a Temporary Restraining Order on June 24, 2003, which restrained defendants and their agents from:
(1) taking ownership, possession or control of the Properties, or any portion or parcel thereof, pursuant to City Ordinance 65741, and/or solely for the private benefit of Defendant Target; and
(2) initiating and/or pursuing any condemnation or other proceeding in the courts of the State of Missouri, seeking to take ownership, possession or control of the Properties, or any portion or parcel thereof, pursuant to City Ordinance 65741, and/or solely for the private benefit of Defendant Target.
Temporary Restraining Order at 3.
This memorandum is being issued to more fully set out the Court's decision in granting the motion for temporary restraining order.

Background.
This case concerns a dispute over the future of the Target retail store located at 4255 Hampton Avenue in the City of St. Louis, Missouri. The plaintiffs are the owners of the real property and building on which the Target store and its attendant parking lots are located. Plaintiffs lease the real property, building and parking lots to Target. Target induced the City of St. Louis to exercise its power of eminent domain and begin condemnation proceedings on the property, in order to turn the property over to Target for redevelopment. Target would become the owner of the property rather than the lessee, and would construct a new Target store on the site. Plaintiffs seek to enjoin the state condemnation proceedings on the basis that their constitutional rights under the Takings Clause of the Fifth Amendment are being violated, as the property is being taken for a private rather than a public use.

*1166 Findings of Fact.

For purposes of the plaintiffs' motion for temporary restraining order, the Court finds the following facts:
The Trust and Adtar (collectively the "Trust Plaintiffs") are the owners and landlords of certain real property, completed buildings and improvements thereon located at and commonly known as 4255 Hampton Avenue, St. Louis, Missouri (the "Trust Premises"), which are being used for a Target retail store (the "Hampton Store"). The Trust and Adtar are tenants in common, each with an undivided fifty percent (50%) interest in the Trust Premises. Plaintiff HVA owns two parcels of real property located at and commonly known as 4255 Hampton Avenue, St. Louis, Missouri ("Parcels A and B"), which are used by Target as parking lots for its Hampton Store. The Trust Premises and Parcels A and B are collectively referred to herein as the "Properties."
Since 1974, Target has operated a retail store on the Trust Premises pursuant to long-term leases with the Trust Plaintiffs (the "Trust/Target Lease"). Pursuant to the Trust/Target Lease, Target leased the Trust Premises for the period of twenty-five (25) years with five (5) renewal options of five (5) years each. In 1999, Target exercised the first of its five-year renewal options under the Trust/Target Lease, and extended the term of the lease until at least 2004. Under the terms of the Trust/Target Lease, Target agreed to (1) take the Trust Premises in their "as is" condition at the time of commencement of the lease term, and (2) make and pay for all maintenance, replacement and repair necessary to keep the Trust Premises in a good state of repair and tenantable condition and to pay for all work required to put the Trust Premises in readiness for operation. The Trust/Target Lease provides that Target could at its own expense make alterations, additions or changes to the building, structural or otherwise, as it deemed necessary or suitable. The Trust/Target Lease further provides that Target must obtain the Trust Plaintiffs' prior written consent to drawings and specifications for structural alterations, but consent cannot be withheld if the building's structural integrity would not be compromised by the proposed work. The Trust/Target Lease gives the Trust Plaintiffs the right to terminate the lease, expel Target and reenter the Trust Premises upon any default by Target that remains uncured for a period of thirty (30) days.
From October 1974 until the present, Target has occupied the Trust Premises and successfully operated its Hampton Store. Neither Target nor the City ever complained to the Trust Plaintiffs about the condition of the Trust Premises. The Hampton Store contains approximately 105,000 square feet and 80,000 feet of retail space. The Hampton Store is Target's fourth-best performing store in the St. Louis region, and reportedly generates $32 million dollars in annual sales for Target.
On approximately September 16, 1974, HVA's predecessor in interest leased Parcel B to Jeanus Realty for twenty-five (25) years, with five (5) renewal options of five (5) years each (the "HVA Main Lease"). On approximately September 30, 1974, Jeanus Realty and Target entered into a sublease (the HVA/Target Sublease), under which Target leased Parcel B for a period of thirty (30) years, with five (5) renewal options of five (5) years each. The HVA/Target Sublease expressly incorporated the terms of the HVA Main Lease. On or about May 1, 1978, Jeanus Realty assigned the HVA/Target Sublease to HVA's predecessor in interest. HVA became the landlord under the HVA Main Lease when it purchased Parcel B. On or about November 12, 1998, Target exercised the first of its five-year renewal options, *1167 which extended its current lease of Parcel B to January 31, 2005.
On approximately July 13, 2001, HVA's predecessor in interest entered into a parking lease with Target for Parcel A, for a period of ten (10) years (the "HVA/Target Parking Lease"). HVA became the landlord under the HVA/Target Parking Lease when it purchased Parcel A.
Target leased both Parcels A and B for use as a parking lot in connection with its Hampton Store. As part of its obligations under the HVA Main Lease, HVA/Target Sublease and HVA/Target Parking Lease, Target must maintain Parcels A and B in good, clean condition and make repairs and replacements which are required for its business purpose or use.
In March 2002, Target sent a letter to the Trust Plaintiffs in New York with a proposal that would allow Target to convert the Trust/Target Lease into a long-term ground lease and give Target the right to demolish the existing Hampton Store and erect a new building. This letter, dated March 25, 2002, included a proposed annual rent amount. The Trust Plaintiffs responded by letter dated May 7, 2002, agreeing to allow Target to demolish the existing store and construct a new one, but proposed that the rent amount be higher and based in part on Target's sales. Target never responded to the Trust Plaintiffs' counterproposal.
Instead, during the late spring or summer of 2002, Target apparently approached Alderman James Shrewsbury, in whose ward the Properties are located, and threatened to abandon the Hampton Store unless Alderman Shrewsbury induced the City to give Target full fee-simple ownership of the Properties through the use of the City's condemnation power. Alderman Shrewsbury was later quoted in the St. Louis Post-Dispatch newspaper as stating:
The New York owners gave Target some unreasonable demands in rent increases, and Target decided to abandon the store .... The decision I had was to allow Target to leave or be a bit proactive and give Target some options with the city helping them ....
A subsequent memorandum to LCRA from a member of the City's Development Corporation states:
[Target] has determined that terms demanded by the owners of [the Trust Premises and Parcels A and B] to renegotiate a long-term lease would impede the viability of its commercial operation in the Area. To date, [Target] and the owners of these parcels have been unable to come to an agreement regarding a sale price. [Target] may require the use of eminent domain in order to facilitate acquisition and to proceed with the proposed redevelopment.
In fact, the Trust Plaintiffs had never demanded any increase in rent, and Target could have continued under its existing lease for years to come. Target's expressed desire to renegotiate the lease led to the discussion about a new rent and the Trust Plaintiffs' counterproposal for a rent based in part on Target's future sales. Target never offered to purchase the Properties from the plaintiffs, and the parties did not engage in any discussions regarding a possible sale. Neither the City nor the LCRA ever advised plaintiffs that the Properties were purportedly blighted, and never offered plaintiffs the opportunity to redevelop their own real estate.
Without plaintiffs' knowledge, Target and the City jointly prepared a redevelopment proposal for the Properties which would appoint Target as the redeveloper. It appears that Target and the City commissioned PGAV Urban Consulting ("PGAV") to prepare a "Qualifications Analysis" (the "Blighting Study") dated *1168 October 26, 2002, which concluded that the Properties were physically deteriorated, unsafe and dangerous, and thus "insanitary" and "blighted" within the meaning of Missouri Revised Statute § 99.320 (2000). A document dated October 9, 2002, appears to show that Target and the City jointly revised and "beefed up" the Blighting Study prior to its issuance. In addition, a letter dated October 28, 2002 addressed to Ms. Lynn Bohlmann of the St. Louis Redevelopment Corporation, from a legal assistant with the law firm of Bryan Cave, counsel for Target, hand-delivered suggested revisions to a Blighting Study and Plan presumably prepared for the City. The letter states in pertinent part:
[P]lease find attached a copy of the Blighting Study and Plan for the Chippewa St./Clifton Ave./Bancroft Ave/Hampton Ave. Area with the suggested revisions. I have also enclosed a blackline version for your easy reference.
Pls.' Ex. 7.
The Blighting Study concludes the Trust Premises are "insanitary" in part because Target's computer and network systems and security systems were deteriorated, even though these are items of personal property. The Blighting Study also concludes that the Hampton Store's electrical and lighting systems, heating and ventilation system, roof system and water and sewer system are deteriorated, but fails to note that under the Trust/Target Lease, Target agreed to do all maintenance, repair and replacement necessary to maintain the Trust Premises in tenantable condition, and had the ability to make additions or changes to the building as it deemed necessary or suitable. As further evidence of the "insanitary" condition of the Trust Premises, the Blighting Study states that several of the down spouts are rusted and leaking, causing the brick facade to be in need of tuck pointing, but fails to note that under the Trust/Target lease, Target is responsible for maintaining, repairing and replacing the down spouts and brick facade. The Blighting Study also notes that the parking lots exhibit cracks and "spalling" pavement, but fails to note that under the HVA Main Lease, HVA/Target Sublease and HVA/Target Parking Lease, Target must maintain, repair and replace the parking lots as required for its business use.
The City scheduled a public hearing on November 30, 2002 before the City Board of Aldermen to consider Board Bill No. 303, pursuant to which the Board sought to declare the Properties blighted under Mo.Rev.Stat. § 99.320, approve Target's proposed redevelopment plan, and authorize LCRA to acquire the Properties through the exercise of eminent domain. Although the City had Plaintiffs' direct address (because it was on the October 8, 2002 Redeveloper's Statement submitted by Target), it ostensibly sought to provide actual notice of the hearing to the Trust Plaintiffs via written notice addressed to the Trust Plaintiffs "in care of Target," and delivered to Target at its Minneapolis headquarters. The Trust Plaintiffs never received this notice, as Target apparently failed to forward it to them. Thus, the Trust Plaintiffs did not know about Target's plan to have the Trust Premises condemned, and had no opportunity to be heard and challenge the plan at the legislative level.
More than one month after the aldermanic hearing, the Trust Plaintiffs first learned from HVA of Target's efforts to have the City and LCRA condemn the Trust Premises. This knowledge came shortly prior to a hearing before LCRA to determine whether Target should be appointed as redeveloper of the Properties.
LCRA had Target's redevelopment proposal in hand for close to two months when, on December 7, 2002 and December *1169 11, 2002, it sought redevelopment proposals for the Properties. On or about December 17, 2002, the Board of Aldermen selected Target as the redeveloper of the Trust Premises and Parcels A and B, by Resolution No. 02-LCRA-7308.
On December 21, 2002, the Board of Aldermen approved Board Bill No. 303, which declared the Properties blighted, approved Target's proposed redevelopment plan, authorized LCRA to acquire the Properties by the exercise of eminent domain, and authorized a tax abatement for Target as the redeveloper under either Mo.Rev.Stat. § 353.120 (2000), or §§ 99.700-99.715 (2000), by Ordinance No. 65741 (the "Ordinance"). The City estimated the impact of the tax abatement Target would enjoy as redeveloper of the Properties at $4 million dollars over a period of ten years. LCRA and Target entered into a Redevelopment Agreement on or about January 12, 2003, under which Target was officially granted redevelopment and condemnation rights over the Properties.
Meanwhile, the Trust Plaintiffs, having learned of Target's efforts to condemn their property, sent a letter to Target dated December 20, 2002, which notified Target that it was in default of the Trust/Target Lease and demanded Target cure its defaults by, inter alia, ceasing and desisting from further participation in the condemnation or redevelopment proceedings. Target made no response to this demand. Trust Plaintiffs then terminated the Trust/Target Lease in accordance with its terms, by letter dated January 20, 2003. Target refused to vacate the Trust Premises and remains in possession thereof, and has continued in its efforts to have the Trust Premises condemned.
On or about January 27, 2003, HVA sent Target notices of default under the HVA Main Lease, Sublease and Parking Lease based upon the purported poor conditions of the parking lots as depicted in the PGAV Blighting Study. HVA demanded that Target remedy its defaults, and cease and desist its breach of the covenant of good faith and fair dealing in failing to pursue good faith negotiations.
By letter of March 27, 2003, the St. Louis Development Corporation and the LCRA offered to purchase the Trust Premises for $2,850,000, which the Trust Plaintiffs assert is grossly below the market price, and threatened to condemn the Trust Premises if the offer was not accepted by April 10, 2003.
On April 4, 2003, plaintiffs filed the instant action and on April 10, 2003, filed a motion for preliminary injunction. On April 23, 2003, LCRA filed a state court condemnation action against the Trust Plaintiffs, HVA and Target. The condemnation hearing in state court was scheduled for June 25, 2003. Plaintiffs filed the instant motion for temporary restraining order on June 9, 2003, asking this Court to prevent the defendants from taking ownership, possession or control of the Properties pursuant to City Ordinance 65741, and from pursuing any condemnation or other proceeding in the courts of the State of Missouri seeking to take ownership, possession or control of the Properties.

Legal Standard.
In determining whether to issue a temporary restraining order the Court must consider the following four factors:
(1) The threat of irreparable harm to the movants;
(2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;
(3) the probability that movants will succeed on the merits; and
(4) the public interest. *1170 Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir.1981) (en banc). The inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Id. Where irreparable harm is not shown, injunctive relief is properly denied. Modern Computer Systems, Inc. v. Modern Banking Systems, Inc., 871 F.2d 734, 738 (8th Cir.1989). The burden of proving these prerequisites is on the party seeking injunctive relief. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir.1987).
In balancing the equities, all factors should be considered to determine whether an injunction should be granted. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1178 (8th Cir.1998). The likelihood of success on the merits is the most significant factor. Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir.1995). Nonetheless, "where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." Dataphase, 640 F.2d at 113.

Discussion.

A. Abstention.
As a threshold matter, defendants assert that the Younger abstention doctrine precludes this Court from addressing the merits of plaintiffs' claims. Generally, federal courts have a "virtual 'unflagging obligation'" to hear cases in their jurisdiction. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). In Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts may not enjoin pending state court criminal proceedings absent very unusual circumstances. The Supreme Court subsequently expanded the Younger doctrine to prohibit federal courts from interfering in certain pending state civil cases. See Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (citing Younger, 401 U.S. at 44, 91 S.Ct. 746). The Court in Middlesex set out a three-part test to decide whether a federal court should abstain from interfering in a pending state civil case or state administrative proceedings that are judicial in nature. Middlesex, 457 U.S. at 432, 437, 102 S.Ct. 2515. Middlesex abstention applies if there is an "ongoing state judicial proceeding," the proceedings "implicate important state interests," and there is "adequate opportunity in the state proceedings to raise constitutional challenges." Id. "If all three questions are answered affirmatively, a federal court should abstain unless it detects `bad faith, harassment, or some extraordinary circumstance that would make abstention inappropriate.'" Night Clubs, Inc. v. City of Ft. Smith, Ark., 163 F.3d 475, 479 (8th Cir.1998) (quoting Middlesex, 457 U.S. at 435, 102 S.Ct. 2515).
The Supreme Court has stated that Younger abstention does not apply to state cases filed after the federal action. Village of Belle Terre v. Boraas, 416 U.S. 1, 2 n. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Younger abstention did not apply where federal suit was filed the day before a notice of ordinance violation was issued); see Cottonwood Christian Ctr. v. Cypress Redevel. Agency, 218 F.Supp.2d 1203, 1218 (C.D.Cal.2002) (abstention not proper in civil case where federal case was filed prior to state condemnation case; citing Village of Belle Terre), and B.A.P., Inc. v. McCulloch, 994 F.Supp. 1131, 1137 (E.D.Mo.1998) (refusing to apply Younger abstention doctrine where, inter alia, state criminal proceeding was filed after plaintiff filed the federal action and received a *1171 hearing date on its motion for preliminary injunction), aff'd, 170 F.3d 804 (8th Cir. 1999); but see Doran v. Salem Inn, Inc., 422 U.S. 922, 929, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (motion to enjoin criminal proceeding was governed by Younger where criminal summons issued the day after the federal suit was filed, federal litigation was in "embryonic stage and no contested matter had been decided.")
This Court concludes that the first part of the Middlesex test is not met because there was no ongoing state judicial proceeding until after this case was initiated and plaintiffs' motion for preliminary injunction was filed. There is no indication the Doran rule applies to state civil proceedings, but assuming that it does, the Court concludes plaintiffs' filing of a motion for preliminary injunction almost two weeks before the state action was filed commenced proceedings on the merits in this case. Cf. Cottonwood, 218 F.Supp.2d at 1218 n. 6.
With respect to the second part of the test, the Court recognizes that states have important interests in matters concerning land use and eminent domain. See Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959).
The third part of the test is also not met, because plaintiffs do not have an adequate opportunity to litigate their constitutional claims in the state court proceeding. As defendants correctly note, the Missouri Supreme Court has held that a defendant in a condemnation action cannot bring a separate action in equity to enjoin the condemnation, and instead must raise any constitutional arguments and defenses in the condemnation proceeding itself. See, e.g., Glueck Realty Co. v. City of St. Louis, 318 S.W.2d 206 (Mo.1958). The Court concludes, however, that plaintiffs' opportunity to raise their constitutional claims in the state proceeding is substantially circumscribed as a result of the summary nature of the condemnation proceeding. See, e.g., State ex rel. Washington Univ. Med. Ctr. Redevel. Corp. v. Gaertner, 626 S.W.2d 373 (Mo.1982) (en banc). Plaintiffs contend they require substantial discovery from defendants in order to adequately present their constitutional claims that the challenged taking is for the benefit of a private party, but discovery in the state condemnation proceeding is significantly limited in both scope and duration.[2] The summary state court process is also inadequate because it prohibits property owners from asserting cross-claims or counterclaims. See id. at 377. As such, plaintiffs cannot subject Target or the City to any liability in the state condemnation proceeding on their claims under 42 U.S.C. § 1983, nor can they assert a Section 1983 counterclaim against the LCRA. Moreover, a decision in the state condemnation proceeding that the taking is constitutional or otherwise authorized would give defendants the potentially successful argument that plaintiffs could not thereafter pursue their Section 1983 claim.[3] See, e.g., Kottschade v. City of Rochester, 319 F.3d 1038, 1041-42 (8th Cir.2003) (discussing possible application of collateral estoppel and res judicata doctrines to a Section 1983 action following *1172 a state court inverse condemnation proceeding), petition for cert, filed, 71 U.S.L.W. 3007 (U.S. June 19, 2003) (No. 02-1848). Thus, Missouri law will afford plaintiffs one limited opportunity to raise their constitutional challenge, based on one to two weeks of discovery.
Perhaps most importantly, the Court concludes this is one of the rare cases in which possible "bad faith, harassment, or some extraordinary circumstance" makes abstention inappropriate. See Middlesex, 457 U.S. at 437, 102 S.Ct. 2515. Plaintiffs have presented evidence that the state court condemnation action is not the product of a legitimate legislative or municipal finding of blight, but rather is the result of LCRA and the City allowing Target to usurp the municipal process and power necessary to find the Properties subject to condemnation, in order to take plaintiffs' Properties for Target's own private purpose. Plaintiffs presented evidence that (1) Target proposed a renegotiation of the Trust-Target Lease, but did not attempt to address the issue further after receiving Trust Plaintiffs' counterproposal; (2) Target told the City it might abandon the Properties because it had been unable to reach an agreement with plaintiffs as to a sale price, although no discussions ever took place between Target and plaintiffs concerning a possible sale of the Properties; (3) Target authored the Blighting Study, or at least the critical part of it finding that the Properties were blighted or insanitary; (4) without plaintiffs' knowledge, Target presented a redevelopment plan for the Properties, under which it would be the redeveloper; and (5) plaintiffs received no notice of the hearing before the Board of Aldermen on November 30, 2002, at which the Board considered declaring the Properties blighted, approving Target's proposed redevelopment plan, and authorizing LCRA to acquire the Properties through the exercise of eminent domain, because the City mailed notice of this hearing to Trust Plaintiffs "in care of Target" at its Minneapolis headquarters and Target apparently failed to forward the notice.
Thus, plaintiffs have presented evidence that the state condemnation action "is the product of actions taken by Target as blighting analyst, municipal legislature and condemning authority, de facto state court condemnation plaintiff, and redeveloper, all rolled into one." Pls.' Joint Reply in Supp. of Mot. for T.R.O. at 18. This evidence shows the existence of an extraordinary circumstance which makes abstention inappropriate.

B. Motion for Temporary Restraining Order.
The Court now turns to the merits of plaintiffs' motion for temporary retraining order. The Fifth Amendment to the United States Constitution prohibits the taking of private property "for public use, without just compensation." U.S. Const, amend. V. The "public use" requirement is an explicit limitation on the government's power of eminent domain. The Supreme Court has "repeatedly stated that `one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.'" Hawaii Housing Auth. v. Midkiff 467 U.S. 229, 241, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (quoting Thompson v. Consolidated Gas Utils. Corp., 300 U.S. 55, 80, 57 S.Ct. 364, 81 L.Ed. 510 (1937)). This limitation on governmental power has been made applicable to the states through the Fourteenth Amendment. See Phillips v. Washington Legal Found., 524 U.S. 156, 162, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). As a result, takings claims are cognizable under 42 U.S.C. § 1983. McKenzie v. City of White Hall, 112 F.3d 313, 316 (8th Cir. 1997).
*1173 Plaintiffs allege that defendants, inter alia, violated their constitutional rights by acting under color of state law to take their property in violation of their constitutional rights. The Court now turns to the four factors of the Dataphase test to determine whether plaintiffs have met their burden to show that a temporary restraining order should issue.

1. Threat of Irreparable Harm.

The first Dataphase factor concerns the threat of irreparable harm to the moving party. The plaintiffs face irreparable harm absent the issuance of a temporary restraining order because they have alleged the imminent violation of their constitutional rights under the Fifth and Fourteenth Amendments. Violations of constitutional rights are deemed irreparable harm for purposes of injunctive relief. See Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Planned Parenthood of Minn., Inc. v. Citizens for Community Action, 558 F.2d 861, 867 (8th Cir.1977) (interference with constitutional rights "supports a finding of irreparable injury"); see also Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 578 (6th Cir.2002) ("denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiffs constitutional rights"); Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir.1996) (presumption of irreparable injury flows from a violation of constitutional rights). Moreover, plaintiffs' constitutional rights may be extinguished if the state condemnation case proceeds because, as discussed above, plaintiffs will have an inadequate opportunity to raise their constitutional claims in the state proceeding and may be precluded from returning to federal court on these claims by virtue of the former adjudication doctrines.
In addition, this is not a case in which plaintiffs' harm can be redressed by monetary damages. "A taking for purely private use is unconstitutional no matter the amount of `just compensation' that may be given." 99 Cents Only Stores v. Lancaster Redevel. Agency, 237 F.Supp.2d 1123 (C.D.Cal.2001) (citing Armendariz v. Penman, 75 F.3d 1311, 1320 (9th Cir.1996) (en banc)). The fact that monetary damages will be insufficient to remedy plaintiffs' harm weighs in favor of enjoining defendants from proceeding with the state condemnation case.

2. Balance of Harm.

The second Dataphase factor requires the Court to balance the harm plaintiffs will face if the temporary restraining order is not issued against the harm to defendants if an order does issue. As discussed above, the plaintiffs face irreparable harm absent the issuance of a temporary restraining order because they have alleged the imminent violation of their constitutional rights, which monetary damages will not remedy.
Conversely, enjoining defendants from condemning the Properties during the pendency of this litigation will not cause them irreparable harm. Defendant Target will continue to operate a profitable store and the City will continue to receive tax revenue from Target. In the event the Court determines that the proposed taking is not for a private purpose, the condemnation process may continue. The Court is very reluctant to interfere in the City and LCRA's exercise of eminent domain, and is respectful of the government's right to appropriate private property for public benefit without delay. This reluctance, however, has been overcome by the serious and highly unusual nature of plaintiffs' allegations in this case. Plaintiffs have alleged a reprehensible scheme by defendants (instigated and engineered by Target, and furthered by Target's misrepresentations to *1174 the City) to take away plaintiffs' property and turn it over to Target, plaintiffs' tenant, allowing Target to become its own landlord and maximize its private profits at the Hampton Store at the expense of plaintiffs and the City.[4] Under this scheme, plaintiffs would be deprived of their valuable property and the right to receive income therefrom in the years to come, and the City would not only fund Target's ownership of the Properties but would also lose several million dollars in tax revenue.
For these reasons, the Court finds that the balance of harm weighs in favor of the issuance of a temporary restraining order.

3. Likelihood of Success of the Merits.

The third Dataphase factor requires the Court to examine the plaintiffs' likelihood of success on the merits. While this factor is the most significant, Minnesota Association of Nurse Anesthetists, 59 F.3d at 83, "where the balance of other factors tips decidedly toward movant a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." Dataphase, 640 F.2d at 113. The Eighth Circuit has recently explained, "At this stage of the litigation, [plaintiffs] are not required to prove a mathematical (greater than fifty percent) probability of success on the merits." Heartland Academy Cmty. Church v. Waddle, 335 F.3d 684, 690 (8th Cir.2003) (citing Dataphase, 640 F.2d at 113).
In order to succeed on their claims under Section 1983, plaintiffs must prove that defendants violated their federal constitutional or statutory rights while acting under color of state law. See Triplett v. Azordegan, 570 F.2d 819, 822 (8th Cir. 1978). In Counts I and II, plaintiffs allege imminent violations of their Fifth and Fourteenth Amendment rights as a result of the state court condemnation proceeding. Plaintiffs allege that the condemnation proceedings are actually a private taking rather than a taking for public use as required by the Constitution. The factual findings set forth above show that plaintiffs may succeed on the merits, and at minimum have raised serious and difficult questions which warrant "more deliberate investigation."
As previously stated, plaintiffs allege a strategy by defendants to "achieve the naked transfer of property from one private party to another." 99 Cents Only Stores, 237 F.Supp.2d at 1129. The evidence presented tends to show that after Target sent a written proposal to the Trust Plaintiffs for conversion of the existing lease to a ground lease and the Trust Plaintiffs responded with a counterproposal, Target decided to cease any negotiation with its landlord and instead approached a City alderman and threatened to abandon the Hampton Store. Target falsely told the alderman that it had been unable to reach an agreement with plaintiffs for purchase of the Properties, and proceeded to offer a redevelopment plan for the Properties under which the City would use its power of eminent domain to condemn the Properties, and Target would become the redeveloper. Target commissioned the Blighting Study which declared the Properties "blighted" and "insanitary" under Missouri law, and then bolstered the findings of blight in the Blighting Study. The findings of blight rested in part on the condition of Target's personal property, and on the substandard condition of property Target itself was obligated to maintain *1175 under the various leases. Finally, Target and the City failed to notify plaintiffs of the Board of Aldermen's hearing on Target's redevelopment proposal, subsequently Target's redevelopment proposal was approved and the state condemnation proceeding began.
If plaintiffs can prove their allegations, the defendants' actions would seem to be not for a "public use" as the Fifth Amendment requires, but rather for the private use of Target. It is clear that Target could have remained a tenant of the Properties under its lease options, continued its negotiations with the Trust Plaintiffs for modification of the Trust/Target Lease, or attempted to purchase the Properties from plaintiffs. Instead, it is alleged that Target decided to attempt to obtain fee simple ownership of the Properties through the City's condemnation powers by falsely threatening to abandon its Hampton Store. The City decided to condemn the Properties in order to appease Target, and acting in concert with Target took the steps necessary to began the state condemnation proceedings.
Recent cases have held that condemnation actions by governmental entities designed to appease private entities amount to unconstitutional takings for purely private purposes. See, e.g., 99 Cents Only Stores, 237 F.Supp.2d at 1129 (holding that a plan condemning commercially viable real estate in order to transfer it to a potentially more lucrative private entity was a private taking; condemnation proceedings were permanently enjoined); Cottonwood, 218 F.Supp.2d at 1232 (plaintiff at minimum demonstrated serious questions about the merits of its private use takings claim and court preliminarily enjoined City from exercising power of eminent domain to take plaintiffs property, where City had denied plaintiffs request for permits to build a church on its site and then began condemnation proceedings in order to allow private retailer to build a store there); Southwestern Ill. Devel. Agency v. National City Environmental, L.L.C, 199 Ill.2d 225, 263 Ill.Dec. 241, 768 N.E.2d 1, 10 (2002) ("SWIDA") (holding that a taking of a recycling facility's property to convey to a racetrack for the purpose of expansion of its parking lot was unconstitutional as it would not achieve a legitimate public use), cert, denied, ___ U.S. ___, 123 S.Ct. 88, 154 L.Ed.2d 135 (2002); see also Armendariz, 75 F.3d at 1321 (concluding that forced sale of property for purpose of allowing private developer to acquire it at reduced price would not be for "public use.") Consequently, the plaintiffs are likely to prevail, or at minimum have raised serious questions on the merits of their private takings claims.
The Court rejects defendants' contention that this case is not ripe for decision. Defendants assert there must be a taking of private property before plaintiffs can assert a claim under the Fifth Amendment's Takings Clause. Defendants contend that no taking has occurred in the state condemnation proceedings, and would not occur until LCRA paid into court the amount of compensation determined to be due to plaintiffs. Defendants rely primarily on Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), for the proposition that a takings claim is not ripe until the plaintiffs demonstrate that they (1) received a final decision from the government regarding the property at issue, and (2) sought compensation through the procedures provided by the state.
"The ripeness doctrine flows both from the Article III cases and controversies limitation and also from prudential considerations for refusing to exercise jurisdiction. The doctrine seeks to prevent *1176 the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Paraquad, Inc. v. St. Louis Housing Auth., 259 F.3d 956, 958 (8th Cir.2001) (internal quotations and citations omitted). "The ripeness inquiry requires examination of both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. To be ripe for decision, the harm asserted must have matured enough to warrant judicial intervention." Id (internal quotations and citations omitted). "The plaintiffs need not wait until the threatened injury occurs, but the injury must be certainly impending." Id at 958-59 (internal quotations and citations omitted).
Plaintiffs' claims are ripe for review because the pending state court condemnation action constitutes a manifest and palpable threat that the Properties will be taken in violation of the Public Use Clause of the Fifth and Fourteenth Amendments. See Goff v. Harper, 60 F.3d 518, 521 (8th Cir.1995) (a "situation is ripe for injunctive relief when "either a constitutional violation has already occurred or the threat of such a violation is both real and immediate.") (internal punctuation and citation omitted). In this case, the threat to plaintiffs' constitutional rights is real and immediate, as the City and LCRA made a final decision to take the Properties and initiated suit to do so. Cf. 99 Cents Only Stores, 237 F.Supp.2d 1123 (granting preliminary injunction pursuant to Section 1983 to enjoin a threatened taking under a city ordinance authorizing condemnation for the sole or primary benefit of a private retailer in violation of the Public Use Clause, although no condemnation proceeding had begun).
In addition, the condemnation ordinance, which declares the Properties to be "blighted" and "insanitary" and authorizes its acquisition through eminent domain, places a cloud on plaintiffs' ownership interests which impairs their ability to borrow against the Properties and diminishes their value. This cloud is a concrete injury that poses a presently justiciable question. See McKenzie, 112 F.3d at 316 (diminution in property value resulting from city's taking of conditional easement as condition to authorization of subdivision redivision was a concrete injury that presented a justiciable controversy). Moreover, the Eighth Circuit has held that a plaintiff need not pursue state procedures for a claim that a city took private property without a justifying public use "because this is a Constitutional violation even if compensation is paid." Id. at 317 (citing Samaad v. City of Dallas, 940 F.2d 925, 936-37 (5th Cir.1991)). Thus, Williamson's exhaustion requirements do not apply when a plaintiff asserts a violation of the Fifth Amendment's Public Use Clause under Section 1983. Id; Montgomery v. Carter County, Term., 226 F.3d 758, 766-67 (6th Cir.2000); Armendariz, 75 F.3d at 1320-21 & n. 5; Samaad 940 F.2d at 936-37.
Finally, defendants assert there is no likelihood of success on the merits because courts will not secondguess a legislative finding of public use. To satisfy the Public Use Clause, a taking need only be "rationally related to a conceivable public purpose." Midkiff, 467 U.S. at 241, 104 S.Ct. 2321. The Supreme Court has made it clear that a court should not "substitute its judgment for a legislature's judgment as to what constitutes a public use unless the use be palpably without reasonable foundation." Id. at 240, 104 S.Ct. 2321 (quotations and citation omitted). "Even under such a deferential standard, however, public use is not established as a matter of law whenever the legislative body acts. While the scope of judicial scrutiny is narrow, `there is, of *1177 course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use.'" 99 Cents Only Stores, 237 F.Supp.2d at 1129 (quoting Midkiff, 467 U.S. at 240, 104 S.Ct. 2321). "Courts must look beyond the government's purported public use to determine whether that is the genuine reason or if it is merely pretext." Cottonwood, 218 F.Supp.2d at 1229; see 99 Cents Only Stores, 237 F.Supp.2d at 1129. The Ninth Circuit has explained that a legislative determination of public use must be examined in order to guarantee the limitations on government power imposed by the Takings Clause:
If officials could take private property, even with adequate compensation, simply by deciding behind closed doors that some other use of the property would be a "public use," and if those officials could later justify their decisions in court merely by positing "a conceivable public purpose" to which the taking is rationally related, the "public use" provision of the Takings Clause would lose all power to restrain government takings.
Armendariz, 75 F.3d at 1321.
The fact that the City has declared the existence of a public use to support its decision to condemn the Properties does not foreclose inquiry into whether the public use is valid within the meaning of the Takings Clause. Cottonwood, 218 F.Supp.2d at 1230. Plaintiffs have therefore shown at least a serious question on the merits of their takings claim on public use grounds.

4. The Public Interest.

The fourth Dataphase factor requires the Court to determine whether the public interest weighs in favor of or against or the issuance of a temporary restraining order. The Court concludes that granting a temporary restraining order will serve the public interest, because it will prevent the violation of plaintiffs' constitutional rights. See G & V Lounge, Inc. v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir.1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights") (citing Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 383, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)).
In addition, the public interest "favors moving very cautiously in condemning private property for uses that are only questionably public." Cottonwood, 218 F.Supp.2d at 1231. The district court in Cottonwood articulated the reasons for this conclusion as follows:
Eminent domain is commonly used to acquire land to build highways and railways. Public utility facilities such as power plants [and] water treatment facilities also have the traditional public use character, as does the construction of government buildings. Eminent domain can even be an effective tool against free-riders who hold-out for exorbitant prices when private developers are attempting to assemble parcels for public places such as an arena or sports stadium. The framers of the Constitution, however, might be surprised to learn that the power of eminent domain was being used to turn the property over to a private discount retail corporation.
Cottonwood 218 F.Supp.2d at 1231.
The Court recognizes that Missouri's redevelopment law contemplates the use of private developers. Nonetheless, the City may not use its power of eminent domain in the manner of a "default broker of land," see SWIDA, 263 Ill.Dec. 241, 768 N.E.2d at 10, to allow tenants to wrest property from their landlords merely to enable the tenant to maximize its profits. As plaintiffs suggest, this "will magnify the financial risk of investing in core City neighborhoods, and *1178 thereby strongly discourage private investment in those areas." Pls.' Mem. Supp. Mot. Prelim. Inj. at 35. Finally, the public may continue to shop at Target's Hampton Store during the pendency of this action and the City will continue to garner tax revenues from its operation.
For these reasons, the Court concludes the public interest strongly favors granting a temporary restraining order.

Conclusion.
For the foregoing reasons, the Court concludes that abstention is not appropriate in this matter. The Court further concludes that plaintiffs' motion for temporary restraining order should be granted, as plaintiffs have met their burden to establish that the balance of equities favors them to the extent "that justice requires the court to intervene to preserve the status quo until the merits are determined." Dataphase, 640 F.2d at 113. Plaintiffs have shown irreparable harm and a reasonable likelihood of success on the merits, and at minimum have "raised questions so serious and difficult as to call for more deliberate investigation." Id. Defendants are therefore temporarily restrained from (1) taking ownership, possession or control of the Properties, or any portion or parcel thereof, pursuant to City Ordinance 65741, and/or solely for the private benefit of Defendant Target; and (2) initiating and/or pursuing any condemnation or other proceeding in the courts of the State of Missouri, seeking to take ownership, possession or control of the Properties, or any portion or parcel thereof, pursuant to City Ordinance 65741, and/or solely for the private benefit of Defendant Target.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs' motion for temporary restraining order is GRANTED in accordance with the Temporary Restraining Order dated June 24, 2003, and plaintiffs' motion for writ of mandamus is DENIED. [Doc. 41-1, 41-2]
IT IS FURTHER ORDERED that because the Temporary Restraining Order provides that it "shall remain in full force and effect until such time as the matter of a permanent injunction is heard by the Court, or this dispute is otherwise finally resolved," plaintiffs' motion for preliminary injunction is DENIED as moot, without prejudice. [Doc. 11]
NOTES
[1] The Court did not consider at the hearing a subsequent motion for temporary restraining order filed on June 23, 2003, by plaintiff Hampton Village Associates, and instead ordered that defendants respond in writing to the motion.
[2] The Court notes that the hearing on the condemnation portion of the state court proceeding was set for June 25, 2003, barely two months after the case was filed in state court.
[3] At the hearing on plaintiff's motion for temporary restraining order, the Court asked Target's counsel whether Target intended to raise collateral estoppel or res judicata in this case following a condemnation hearing in state court. Counsel responded that Target would assert whatever arguments were "legally proper." See Tr. of TRO Hearing at 119. The Court interprets this statement to mean that Target would assert defenses of collateral estoppel or res judicata in subsequent proceedings in this action.
[4] Because the allegations in this case are so unusual, and appear to be supported by some evidence, the Court discounts defendants' stated concern that the issuance of a temporary restraining order in this case will open the floodgates of federal court litigation by property owners facing condemnation.