# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-2825/2827

_____

| | | |
|---|---|---|
| Jeffrey S. Aaron, an individual residing in Florida, as the trustee of a New York revocable trust, Sylvia H. Aaron; ADTAR, L.L.C., a Delaware limited liability company; Hampton Village Associates, L.L.C., a New York limited liability company and successor-in-interest to the Estate of Louis Feil, | * * * * * * * * * | |
| Plaintiffs/Appellees, | * * | |
| v. | * * | Appeals from the United States District Court for the |
| Target Corporation, formerly known as Target Stores, Inc., formerly known as Dayton Hudson Corporation, a Minnesota corporation, | * * * * * | Eastern District of Missouri. |
| Defendant/Appellant, | * * | |
| City of St. Louis, MO, a Missouri municipal corporation; The Land Clearance for Redevelopment Authority of the City of St. Louis, a Missouri municipal corporation, | * * * * * * | |
| Defendants/Appellants. | * | |

_____

Submitted: October 20, 2003
Filed: February 3, 2004

_____

Before MURPHY, BOWMAN, and MELLOY, Circuit Judges.
_____

MURPHY, Circuit Judge.

Jeffrey S. Aaron, ADTAR, and Hampton Village Associates[1] brought this action under 42 U.S.C. § 1983 against Target Corporation, the City of St. Louis, and the Land Clearance for Redevelopment Authority of the City of St. Louis (Redevelopment Authority). Plaintiffs sought to enjoin condemnation proceedings involving their property, which they allege was to be taken for a private use. The district court granted a temporary restraining order (TRO) and later converted it sua sponte into a preliminary injunction, enjoining defendants from taking ownership, possession, or control of the subject property and from going forward with condemnation proceedings in state court. Target, the city, and the Redevelopment Authority appeal from the order for preliminary injunction.[2] We reverse.

I.

The property which is the subject of the condemnation proceeding is located at the intersection of Hampton and Chippewa Avenues in St. Louis, Missouri.

_____

[1]Plaintiff Jeffrey S. Aaron, is a resident of Florida and trustee of the Sylvia H. Aaron Revocable Trust, a New York revocable trust. The trust is a tenant in common with ADTAR, a Delaware limited liability company with its principal place of business in New York. Each owns an undivided fifty percent interest in both the building in which the Target store is located and the ground on which the building is situated. Hampton Village Associates is a New York limited liability company and the successor in interest to the Estate of Louis Feil, owner of two parcels that Target leases for parking.

[2]The Redevelopment Authority and the City of St. Louis filed their notice of appeal on July 16, 2003 from the preliminary injunction issued on July 8, 2003; their appeal was docketed as No. 03-2825. Target's appeal from the injunction was filed the same day and was docketed as No. 03-2827. We have jurisdiction over the appeals under 28 U.S.C. § 1292(a)(1).

2

Appellees own the building which houses a Target store and the property on which it and the adjoining parking lots are located. Target Corporation entered into a long term lease with them in October 1974 for a period of twenty five years, with five renewal options of five years each. The lease covers a store building which was previously leased to Arlans Department Stores, Inc., a discount retailer. Target agreed to maintain the property and its improvements and had the right to make alterations, additions, or changes to the building.

In March 2002 Target contacted the owners about its interest in replacing what it regarded as an obsolete store with a larger facility. Target proposed to demolish the existing store and to build a new one. In May 2002 appellees responded that they were not opposed to demolition of the existing store, but they wanted more rent, to be partially based on sales at the new facility. No further proposals were exchanged, and no agreement was reached.

Alderman James Shrewsbury represents the ward in which the property is located. He became concerned in September 2002 that Target would close its store if the property owners would not agree to terms it considered acceptable, and he initiated discussions with Target. He also raised the possibility of using the city's eminent domain power to facilitate redevelopment of the property, and he asked the Redevelopment Authority to conduct a study to determine whether the property was blighted. The Redevelopment Authority hired a private consulting company, PGAV Urban Consulting (PGAV), to analyze the property. PGAV prepared a Qualifications Analysis (PGAV Study) which was issued on October 26, 2002. The study found that the property was physically deteriorated, unsafe, and dangerous and concluded that

it was  "blighted"[3] or "insanitary"[4] within the meaning of Chapter 99 of the Revised Statutes of Missouri.

A public hearing was scheduled for November 20, 2002, at which the St. Louis City Board of Aldermen would consider the PGAV Study.  The study had been introduced by Alderman Shrewsbury as Board Bill No. 303 to initiate condemnation proceedings for the property.  He believed that Target's redevelopment would benefit his ward and the city as a whole.  The city sent written notice of the public hearing to the Aaron Trust and ADTAR, care of Target's Minneapolis headquarters which was the address on file for the property at the assessor's office.  Notice of the hearing was also placed in the St. Louis Post Dispatch, but apparently the only plaintiff actually receiving notice before the November 20 hearing was Hampton Associates, which declined to attend.  The Board of Aldermen passed Board Bill No. 303 on December 6, 2002, and it later became Ordinance 65741.

---

[3]"Blighted area", an area which, by reason of the predominance of defective or inadequate street layout, insanitary or unsafe conditions, deterioration of site improvements, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use.  Mo. Rev. Stat. § 99.320(3) (2003).

[4]"Insanitary area", an area in which there is a predominance of buildings and improvements which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air sanitation or open spaces, high density of population and overcrowding of buildings, overcrowding of land, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime or constitutes an economic or social liability and is detrimental to the public health, safety, morals, or welfare.  Mo. Rev. Stat. § 99.320(9) (2003).

The Redevelopment Authority published notices in the St. Louis Post Dispatch on December 7 and 11, seeking redevelopment proposals for the property. Only Target submitted a proposal, and the Redevelopment Authority selected Target as the redeveloper on December 17, 2002. Attorneys for the property owners first appeared to oppose condemnation of their property at the December 17 meeting of the Redevelopment Authority.

On December 21, 2002, the St. Louis mayor signed Ordinance 65741. The ordinance declared the subject property blighted, approved Target's redevelopment proposal, authorized the Redevelopment Authority to acquire the property by eminent domain, and authorized a tax abatement for Target. The Redevelopment Authority and Target then entered into a Redevelopment Agreement on January 12, 2003, which officially granted Target redevelopment rights over the property. On January 28, 2003, the board of the Redevelopment Authority met to discuss the use of its eminent domain power to acquire the property. Representatives of the property owners appeared and raised objections, but the board approved the use of eminent domain for the property.

Before initiating a condemnation action in state court, the Redevelopment Authority made an offer on March 27, 2003 to purchase the property from the owners, as required by state eminent domain law. See Res. No. 03-LCRA-7341E; see also Mo. Rev. Stat. § 99.460 (2003). The offer totaled $3.79 million and was based on an independent real estate appraisal. The property owners were informed that the offer would remain open until April 10, 2003, but they never responded to it. Instead, they filed this § 1983 action on April 4 and a preliminary injunction motion on April 10, 2003.

The Redevelopment Authority filed a condemnation action against the property owners and Target in the Circuit Court of the City of St. Louis on April 23, 2003. A trial was initially set in the circuit court for May 27, but it was later rescheduled to June 25, 2003 because the property owners requested a change in judge. On May 20

5

the property owners requested expedited discovery in the condemnation action, and on May 21 they moved to dismiss the eminent domain case on the basis that the taking was for a private purpose. A discovery schedule was set by the circuit court on June 11; it gave the parties two weeks for production of public records and for seven depositions. A protective order was also issued.

On June 9, 2003, the property owners moved for a TRO in federal court. The Redevelopment Authority and Target submitted memoranda in opposition to the TRO on June 17, which included an argument for abstention. The district court set the motion for hearing on June 24, 2003, the day before the state condemnation trial was to begin. The parties argued their positions at the hearing, but they did not call witnesses or offer other evidence. At the hearing the district court stated that it would grant a TRO to "give myself some time to look at this matter because I'm not sure about it." A written order was issued the same day, restraining appellants from taking the plaintiffs' property and from pursuing the state court condemnation action. The court stated that the property owners had shown they were likely to succeed on their constitutional claims, that defendants had acted in concert to take their property for purely private use, and that they faced irreparable harm. The TRO provided that it would remain in "full force and effect until such time as the matter of a permanent injunction is heard by the Court, or this dispute is otherwise finally resolved."

The parties furnished additional materials to the district court on June 30, 2003, including affidavits and memoranda in which appellants elaborated on their argument that the court should abstain in favor of the state eminent domain proceedings. The district court issued a written memorandum and order on July 3, 2003 "to more fully set out the Court's decision in granting the motion for temporary restraining order." In addition to discussing the factors for injunctive relief under Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc), the court gave its reasons for declining to abstain from exercising jurisdiction. Aaron v. Target Corp., 269 F. Supp. 2d 1162, 1170-73 (E.D. Mo. 2003). Then on July 8, 2003, without advance notice to the parties or further hearing, the district court sua sponte converted

6

the TRO into a preliminary injunction "which shall remain in effect pending a final decision on the merits or further order of the Court." The short order incorporated the court's memorandum and order of July 3 by reference and simply stated that the court had concluded that the TRO should be converted to a preliminary injunction.

In explaining its decision not to abstain the court stated that "there was no ongoing state judicial proceeding until after this case was initiated and plaintiffs' motion for preliminary injunction was filed," and that filing of that motion "commenced proceedings on the merits in this case." Id. at 1171. The court went on to conclude that "plaintiffs do not have an adequate opportunity to litigate their constitutional claims in the state court proceeding," because it was summary in nature, with limited scope and duration of discovery, and did not permit counterclaims or crossclaims. Id. at 1171-72. "Perhaps most importantly" the court concluded, this is a case fitting the bad faith exception to the Younger doctrine. Id. at 1172.

The court's order on July 8 converting the TRO into a preliminary injunction did not itself recite what it enjoined. Rather, it referred to the content of its July 3 memorandum and order which stated its reasons for the TRO and enjoined Target, the city, and the Redevelopment Authority from taking ownership, possession, or control of the federal plaintiffs' property pursuant to City Ordinance 65741 and from initiating or pursuing any condemnation or other proceeding in the state courts seeking to take ownership, possession, or control of the property.

Target, the city, and the Redevelopment Authority appeal from the preliminary injunction issued on July 8, 2003. They contend that the district court should have abstained under the Younger doctrine, that this case is not ripe, that the property owners did not make a sufficient showing for an injunction under Dataphase, and that the court's sua sponte conversion of the TRO into a preliminary injunction without notice or hearing violated Fed. R. Civ. P. 65(a)(1). The property owners respond that the district court did not abuse its discretion by refusing to abstain or by granting the

7

preliminary injunction. They maintain this case is ripe and also seek to raise a new argument on appeal—that a federal court need not abstain for state judicial review of legislative and administrative action, citing New Orleans Pub. Serv., Inc. v. City of New Orleans [NOPSI], 491 U.S. 350 (1989).

## II.

A district court has broad discretion when ruling on a request for preliminary injunction, and it will be reversed only for clearly erroneous factual determinations, an error of law, or an abuse of its discretion. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998). A district court's abstention decision is also reviewed for abuse of discretion, but the underlying legal determinations receive plenary review. Cedar Rapids Cellular Tel., L.P. v. Miller, 280 F.3d 874, 878 (8th Cir. 2002) (citing Beavers v. Arkansas State Bd. of Dental Exam'rs, 151 F.3d 838, 840 (8th Cir. 1998)). The abuse of discretion standard means that a court has a "range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Verizon Communications, Inc. v. Inverizon Int'l, Inc., 295 F.3d 870, 873 (8th Cir. 2002) (citing Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984)). An abuse of discretion occurs if a relevant factor that should have been given significant weight is not considered, if an irrelevant or improper factor is considered and given significant weight, or if a court commits a clear error of judgment in the course of weighing proper factors. Id.

The threshold question in this case is whether the district court abused its discretion by declining to abstain and instead proceeding to enjoin the parties from going forward with the eminent domain action. Under Younger v. Harris, 401 U.S. 37 (1971), federal courts should abstain from exercising jurisdiction in cases where equitable relief would interfere with pending state proceedings in a way that offends principles of comity and federalism. Accord Night Clubs, Inc. v. City of Fort Smith, 163 F.3d 475 (8th Cir. 1998). The motivating force behind Younger abstention is the promotion of comity between state and federal judicial bodies. See Cedar Rapids

8

Cellular, 280 F.3d at 881. The Younger doctrine was originally applied to state criminal proceedings, see, e.g., Hicks v. Miranda, 422 U.S. 332 (1975), and later extended to civil cases. See, e.g., Moore v. Sims, 442 U.S. 415 (1979) (child abuse litigation); Trainor v. Hernandez, 431 U.S. 434, 444 (1977) (welfare fraud action); Huffman v. Pursue, Ltd., 420 U.S. 592, 594 (1975) (obscenity regulation).

In Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982), the Supreme Court identified several factors that should lead to abstention under Younger: (1) the existence of an ongoing state judicial proceeding, (2) which implicates important state interests, and (3) which provides an adequate opportunity to raise constitutional challenges. See also Silverman v. Silverman, 267 F.3d 788, 792 (8th Cir. 2001).

Whether there is an ongoing state judicial proceeding that would be disrupted by the federal action is the first Middlesex inquiry. See Alleghany Corp. v. McCartney, 896 F.2d 1138, 1143 (8th Cir. 1990). Permitting issues before a state court to be litigated in a federal forum instead could be "quite costly" to the comity and federalism interests which Younger seeks to protect. Huffman, 420 U.S. at 605-06. See also Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 (1987); Yamaha Motor Corp. v. Riney, 21 F.3d 793, 797-98 (8th Cir. 1994). Appellants argue that the district court erred by not considering the actual status of the state eminent domain proceedings and by applying a simple first filed rule. They contend that this federal case was only in an embryonic stage at the time the state court action was initiated and that the state eminent domain process had begun with the passage of Ordinance 65471 in December 2002. The property owners counter that no state judicial proceedings were ongoing until almost two weeks after they filed for injunctive relief in federal court on April 10, 2003.

There is no fixed requirement in the law that a state judicial proceeding must have been initiated before the federal case was filed for abstention to be appropriate, and a court should examine what has actually taking place in both settings to decide

9

whether to abstain.  See C. Wright & A. Miller, 17A Federal Practice & Procedure § 4253 (2d ed. 1988) (commencement dates of the state and federal actions are less significant than apparent right after Younger).  Whether proceedings of substance have taken place in either court is a key factor.  In Hicks, for example, the Supreme Court ruled that the federal court should have abstained even though its case was filed before state criminal proceedings had been initiated.  The reason was that no proceedings of substance had yet occurred in federal court, and a failure to abstain under such circumstances would "trivialize" Younger principles.  Hicks, 422 U.S. at 350.  See also Doran v. Salem Inn, Inc., 422 U.S. 922, 929 (1975) (abstention warranted in first filed federal litigation where it was in embryonic stage with no contested matter decided); Anderson v. Schultz, 871 F.2d 762, 764-65 (8th Cir. 1989) (abstention appropriate where federal claim filed the same day as state charges).  This inquiry also applies in the civil context if important state interests are at stake.  See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 n.1 (1992) (noting Younger's relevance to pending or about to be pending civil action involving important state interests).

The condemnation proceeding against appellees' property had been initiated under Chapter 99 of the Missouri statutes by passage of Ordinance 65471 on December 6, 2002.[5]  See Mo. Rev. Stat. § 99.430.1(2) (2003).  The subject property

_____

[5]The district court concluded that this had placed a cloud on the property owners' interests presenting a justiciable question, that "takings claims are cognizable" under § 1983, and that state procedures need not be pursued first, citing McKenzie v. City of White Hall, 112 F.3d 313, 316-17 (8th Cir. 1997).  McKenzie was a very different case from the one here, however.  The plaintiffs there sought compensation for the physical taking of a buffer property and for the city's creation of a nuisance and its denial of building permits and zoning approvals.  We held that the federal district court had properly dismissed the takings claim because plaintiffs should have availed themselves of the state inverse condemnation procedure.  The constitutional claims in contrast were based on final decisions and could proceed.  Abstention was not an issue in McKenzie where there was no ongoing eminent domain proceeding or pending state court action.

10

was declared to be blighted or insanitary and the Redevelopment Authority was authorized to exercise its duties, powers, and functions, see Mo. Rev. Stat. §§ 99.300-.660 (2003), to prepare and carry out plans of redevelopment and to determine a fair sales price. See State ex rel. Dalton v. Land Clearance for Redev. Auth., 270 S.W.2d 44 (Mo. 1954). On January 28, 2003, the Redevelopment Authority's acquisition of the subject property by the exercise of the power of eminent domain was authorized in accordance with Mo. Rev. Stat. § 99.460. On March 27, 2003 the Redevelopment Authority fulfilled its statutory duty to make a good faith offer to purchase appellees' property.

State litigation was certain to follow if the property owners did not respond affirmatively to the purchase offer.[6] The property owners filed their federal complaint on April 4, 2003, approximately a week before the expiration of the Redevelopment Authority's purchase offer which was required by state law to remain open until April 10. See Mo. Rev. Stat. §§ 99.300, 99.420 (2003). They filed their preliminary injunction motion in the district court on April 10, the last day on which they could be sure no action would be started in the state court because the Redevelopment Authority could not file suit until after its purchase offer had expired. See id. At that time the eminent domain proceedings had been ongoing for more than five months, and the property owners were on notice that state judicial proceedings were the next stage of the process.

---

[6]The Redevelopment Authority's letter to plaintiffs of March 27, 2003, stated: "I am obliged to inform you that the [Redevelopment Authority] has been given the power of eminent domain to acquire the Property should any discussions you wish to initiate regarding the enclosed Contracts not result in a purchase. If we do not receive a response to this offer from you by the stated time and date [April 10, 2003], the [Redevelopment Authority] will assume that you have rejected its offer to purchase and it will proceed to acquire the Property through the exercise of its power of eminent domain."

Missouri law provides that eminent domain proceedings culminate in condemnation actions in state court, and the state action here was filed by the Redevelopment Authority on April 23, 2003. Trial was set for May 27 in the state case, and the property owners filed two motions. On May 20 they moved for expedited discovery, and on May 21 they filed a motion to dismiss on the merits. A request by the property owners for a different judge delayed the state trial date to June 25, but in the meantime the state court ruled on permissible discovery, set deadlines, and issued a protective order. The state eminent domain case was thus developing for some six weeks after it was filed, while the property owners did not seek a TRO from the federal court until June 9. Then on June 24 the federal district court halted any further developments in the state case by issuing a TRO the day before the continued trial was to begin. The injunction which is the subject of these appeals was not issued until July 8, 2003, approximately eleven weeks after the state case had been filed. At that point in time the substantive issues in the state court action could have been well developed absent the federal TRO.

At the time the court issued its TRO on June 24 the only developments in federal court had been the filing of motions for injunction and TRO and the TRO hearing. The only further acts in this case before the injunction which is the subject of these appeals were the submission of memoranda and affidavits and the court's memorandum and order of July 3. The state action on the other hand had been scheduled for trial the morning after the TRO was issued, and discovery and motions had preceded. We conclude that the federal case was not really advanced in "proceedings of substance on the merits." See Hicks, 422 U.S. at 337; id. at 353 n.1 (Stewart, J., dissenting) (TRO motion and response filed with twelve affidavits and additional documents and TRO hearing did not commence "proceedings of substance on the merits"). The Supreme Court's approach to the issue is illustrated in Doran, where abstention was held necessary even though the federal district court had denied a TRO and set a hearing date for a preliminary injunction motion before the state action was started. 422 U.S. at 924-25.

12

In this case the district court concluded in its July 3 order incorporated into the injunction order of July 8, that the mere filing of a preliminary injunction motion in federal court on April 10 amounted to proceedings on the merits occurring before the state action was filed on April 23.[7] We disagree. We conclude that the district court erred by concentrating on filing dates rather than by examining all the facts and context of the two actions and by concluding that there was no ongoing state judicial proceeding within the meaning of Middlesex.

The second Middlesex requirement is that the ongoing state proceeding involve an important state interest. Eminent domain proceedings have long been recognized as an important state interest. See Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28 (1959) (eminent domain is "intimately involved with state prerogative"). See also Edwards v. Arkansas Power & Light Co., 683 F.2d 1149, 1156 (8th Cir. 1982) (important state interests in eminent domain proceedings make abstention particularly appropriate). There is no dispute here that condemnation proceedings meet this test, and the district court properly so held.

The third Middlesex factor is whether the state proceedings are adequate. Appellants argue that the Missouri eminent domain proceedings are adequate because

---

[7]The three cases cited by the district court to support its conclusion that there was not an ongoing state proceeding are distinguishable. In our case condemnation proceedings had been filed in state court and the parties had obtained a discovery schedule and trial date when the injunction issued, whereas in Village of Belle Terre v. Borass, 416 U.S. 1, 2 n.1 (1974), there had only been notice of a state ordinance violation. In Cottonwood Christian Ctr. v. Cypress Redev. Agency, 218 F. Supp. 2d 1203, 1218 (C.D. Cal. 2002), the federal case was filed four months before the state eminent domain action and work had progressed on the federal merits. The property owners here may raise their constitutional claims in state court unlike the situation in B.A.P., Inc. v. McCulloch, 994 F. Supp. 1131, 1137 (E.D. Mo. 1998), aff'd 170 F.3d 804 (8th Cir. 1999), where a First Amendment challenge to a statute with no provision for a post seizure hearing could not be addressed in state court until criminal charges were filed.

they provide sufficient discovery rights and permit the raising of all claims plaintiffs assert in this federal action. The property owners disagree and argue that discovery is limited in the state case in which they would be unable to raise all of their issues, especially the claim that the private use taking was unconstitutional.

The argument that the state proceedings are inadequate because of limited discovery is not persuasive. Missouri courts consider the purpose of requested discovery and the circumstances of the case before deciding whether to permit discovery at the initial stage of a condemnation proceeding. See State ex rel. Rantz v. Sweeney, 901 S.W.2d 289, 292 (Mo. App. 1995). Discovery is allowed on whether the state has the right to condemn a particular property, id. at 293, but reasonable limits on discovery can prevent "a single objecting landowner [from delaying] the commencement of [a] project for months or years by interrogatories, depositions, discovery or dilatory practices." State ex rel. Missouri Highway & Transp. Comm'n v. Anderson, 735 S.W.2d 350, 352 (Mo. banc 1987). The condemnation process is designed to guarantee "the public early commencement of [a] project while preserving to the individual landowners the right at a later date to extensively and thoroughly litigate all issues relating to damages for the taking." Id. In this case, the property owners were given up to two weeks to conduct discovery, the opportunity to take seven depositions, and the right to obtain all of the Redevelopment Authority's relevant and nonprivileged documents. They have not shown that their discovery opportunities were inadequate or unreasonable.

Also relevant is whether the property owners would have an adequate opportunity to raise their constitutional challenge in the state action. Under Missouri law the circuit court must determine at the outset whether the condemnation is authorized by state law, that is, whether there is jurisdiction over the condemnation proceeding. Anderson, 735 S.W.2d at 352; State ex rel. Devanssay v. McGuire, 622 S.W.2d 323, 325 (Mo. App. 1981). This determination may involve an assessment of whether there is constitutional, statutory, or ordinance authority for the exercise of eminent domain, whether the taking is for a public use, and whether the

14

condemning authority complied with the conditions precedent to bringing the court action. Devanssay, 622 S.W.2d at 325. The landowner's damages from the taking are determined at a second stage when either side may request a jury trial, and the case may be appealed after the damages phase is complete. Id.; Anderson, 735 S.W.2d at 352.

Since Missouri statutes and case law contemplate that constitutional challenges will be raised as defenses to a condemnation, appellees will have an adequate opportunity in the state condemnation proceedings to assert their claim that the taking of their property is for a private use. See Glueck Realty Co. v. City of St. Louis, 318 S.W.2d 206 (Mo. 1958). Accord Lia v. Broadway/Olive Redev. Corp., 647 S.W.2d 189 (Mo. App. 1983) (allegations raised against a condemnation ordinance could also be raised as defenses in any future condemnation action). There is an extensive body of Missouri appellate cases deciding whether a taking is for a private purpose. See, e.g., State ex rel. Clothier v. Yeaman, 465 S.W.2d 632 (Mo. banc 1971); State ex rel. Gove v. Tate, 442 S.W.2d 541 (Mo. banc 1969); Annbar Assocs. v. West Side Redev. Corp., 397 S.W. 2d 635 (Mo. 1966). We conclude that the court erred in finding that the property owners did not have an adequate opportunity to raise their principal claim, that the taking is for a private use, in the state court eminent domain proceedings.

Federal abstention in this case would permit Missouri's condemnation procedures to run their course. Eminent domain is an appropriate tool to help neighborhoods remain economically viable, attract industry, and encourage future growth. See generally Dolan v. City of Tigard, 512 U.S. 374 (1994); Thomas Merrill, The Economics of Public Use, 72 Cornell L. Rev. 61 (1986). Missouri has adequate judicial procedures for consideration of the parties' competing interests. Land use policy is an area in which federalism principles are particularly strong as we recognized in Night Clubs, Inc., 163 F.3d at 481 (enforcement and application of zoning ordinances and land use regulations is an important state and local interest).

We conclude that all the Middlesex factors are satisfied here and that the district court erred in its conclusion that the state procedures are inadequate.

Even if the Middlesex factors are met, federal courts should not abstain under Younger if "'bad faith, harassment, or some extraordinary circumstance . . . would make abstention inappropriate.'" Night Clubs, Inc., 163 F.3d at 479 (quoting Middlesex, 457 U.S. at 435). The district court concluded that the bad faith exception applies here because the state court condemnation action did not result from a legitimate legislative or municipal finding of blight, but rather from the defendants' conspiring to take plaintiffs' property for a private use. Appellants argue the facts do not fit the exception, while the property owners assert that appellants wrongfully conspired to take their land for a private use.

While the Supreme Court has not ruled out use of the bad faith exception in civil cases, see Huffman, 420 U.S. at 611, it has never directly applied the exception in such a case, and we have only recognized it in the criminal context. See Lewellen v. Raff, 843 F.2d 1103, 1109-10 (8th Cir. 1988). Such an exception must be construed narrowly and only invoked in "extraordinary circumstances." Younger, 401 U.S. at 53-54. After studying the record, we conclude there was insufficient evidence here to demonstrate "bad faith" or "extraordinary circumstances."[8] As explained in Moore, 442 U.S. at 433, intervention by federal courts in ongoing state proceedings requires that the "circumstances must be 'extraordinary' in the sense of

_____

[8]Appellees presented evidence that Target proposed a renegotiation of the lease but did not attempt to address the issue further after receiving their counterproposal; Target told the city it might abandon the properties because it had been unable to reach an agreement with the property owners as to a sale price but no discussions had taken place between the parties; Target authored the PGAV Study, or at least the critical part of it; Target presented a redevelopment plan for the properties without their knowledge; and they received no notice of the hearing before the Board of Aldermen on November 20, 2002 because the city sent the notice to the Aaron trust and ADTAR in care of Target at its Minneapolis headquarters.

creating an extraordinary pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." The property owners did not show that the bad faith or extraordinary circumstances exception to the Younger doctrine is applicable.[9]

The property owners also seek to raise a new argument in support of the district court's decision not to abstain. In an argument not raised below, they cite NOPSI, 491 U.S. at 368-70, for the proposition that federal courts need not defer to state judicial review of legislative or administrative determinations. They argue that eminent domain proceedings are inherently legislative in nature. Appellants counter that they are inherently judicial and that NOPSI is inapplicable. Arguments and issues raised for the first time on appeal are generally not considered, see Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1130 n.2 (8th Cir. 2001) (citing Tarsney v. O'Keefe, 225 F.3d 929, 939 (8th Cir. 2000)), and no good reason has been advanced to depart from that rule.[10]

---

[9]We note that the property owners can seek to raise issues of bad faith in the state court action. In a Missouri eminent domain action, a landowner can rebut the presumption of validity of the public use determination by stating that the legislative body acted "arbitrarily or was induced to act by fraud, collusion, or bad faith." State ex rel. United States Steel v. Koehr, 811 S.W.2d 385, 389-90 (Mo. 1991).

[10]Even if we were to consider this belated argument, it would not affect the outcome. NOPSI involved a city council rate setting proceeding which the Supreme Court found to be a legislative function. Missouri condemnation proceedings involve both legislative and judicial functions at different stages, and the state court action in which private property is condemned for a public use is judicial in nature. See, e.g., State ex rel. Applegate v. Taylor, 123 S.W. 892 (Mo. 1909); St. Joseph v. Truckenmiller, 81 S.W. 1116 (Mo. 1904); Thompson v. Chicago, Santa Fe & California R.R. Co., 19 S.W. 77, 80 (Mo. 1892).

### III.

After considering the arguments of the parties and the record on appeal, we conclude that the district court erred in concluding that only one of the <u>Middlesex</u> factors favored abstention and that the bad faith exception to <u>Younger</u> was applicable. In the circumstances of this case it was an abuse of discretion for the district court not to abstain and permit the state eminent domain action to go forward. It was likewise an abuse of discretion for the court to exercise jurisdiction and to issue the preliminary injunction.[11]

Accordingly, we reverse the district court's order enjoining the parties from proceeding with the state eminent domain action and its decision not to abstain under <u>Younger</u>. The case is remanded to the district court for vacation of its injunction and for entry of an abstention order.

_____

---

[11] Because of these conclusions, we need not address the other arguments raised by appellants, but there is an outstanding motion. Shortly before oral argument, appellees moved to correct misstatements of the appellate record and to take judicial notice of City of St. Louis Board Bill No. 303. We have considered the arguments raised in support of the motion along with the record on appeal and now deny the motion as moot.