# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-3044

_____

Central Valley Ag Cooperative, for itself and as Fiduciary of the Central Valley Ag Cooperative Health Care Plan

*Plaintiff - Appellant*

Central Valley Ag Cooperative Health Care Plan

*Plaintiff*

v.

Daniel K. Leonard; Susan Leonard; The Benefit Group, Inc.; Anasazi Medical Payment Solutions, Inc., Advanced Medical Pricing Solutions, Inc.; Claims Delegate Services, L.L.C.

*Defendants - Appellees*

Linus G. Humpal

*Defendant*

GMS Benefits, Inc.

*Defendant - Appellee*

_____

No. 20-1378

_____

Central Valley Ag Cooperative, for itself and as Fiduciary of the Central Valley Ag Cooperative Health Care Plan

*Plaintiff - Appellant*

Central Valley Ag Cooperative Health Care Plan

*Plaintiff*

v.

Daniel K. Leonard; Susan Leonard; The Benefit Group, Inc.; Anasazi Medical Payment Solutions, Inc., Advanced Medical Pricing Solutions, Inc.; Claims Delegate Services, L.L.C.

*Defendants - Appellees*

Linus G. Humpal

*Defendant*

GMS Benefits, Inc.

*Defendant - Appellee*

_____

Appeals from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 17, 2020
Filed: February 1, 2021

_____

Before BENTON, ERICKSON, and GRASZ, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Central Valley Ag Cooperative ("Central Valley") is a large Nebraska agricultural cooperative. In 2015 and 2016, Central Valley offered its employees the opportunity to participate in a self-funded health care plan. Central Valley sued various defendants who either marketed or administered those health care plans alleging that the defendants breached various fiduciary duties and engaged in various prohibited transactions, all in violation of the Employee Income Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The district court[1] granted summary judgment in favor of all defendants and awarded them attorney's fees. Central Valley appeals. We affirm.

## I. BACKGROUND

In 2014, Central Valley merged with United Farmers Cooperative. After the merger, Central Valley wanted to adopt a single self-funded health care plan for all of its employees. It sought out a broker, defendant Group Marketing Services, Inc. ("GMS Benefits"), with whom United Farmers Cooperative had previously worked, to provide it with options.

GMS Benefits offered Central Valley a choice of plans, including one that relied on a Medical Bill Review ("MBR") system, which Central Valley adopted for 2015. Under the MBR system, certain medical bills were sent to a reviewer and the reviewer decided whether the medical bill contained errors or excessive charges. The reviewer then made a recommendation to Central Valley as to how much of the bill should be paid. The purpose of the MBR system was to reduce the amount paid to medical providers, thereby reducing the cost of Central Valley's self-funded health care plan.

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska, now deceased.

During 2015, each medical bill submitted to Central Valley's health care plan was forwarded to a third-party administrator, defendant The Benefit Group ("TBG"). TBG in turn sent the bill to defendant Anasazi Medical Payment Solutions, Inc. ("AMPS"), who actually reviewed the medical bill and made payment recommendations. When AMPS completed its review, AMPS forwarded its recommendations to TBG, and TBG in turn forwarded the recommendations to Central Valley. In essence, TBG was a middle-man passing on the information it received from AMPS. Once Central Valley received the recommendation, it decided whether to pay the recommended amount or a greater or lesser amount. The final payment amount was Central Valley's call. When TBG was informed of Central Valley's decision, it paid that amount on Central Valley's behalf.

AMPS and TBG were compensated for their work administering Central Valley's MBR plan. Specifically, AMPS earned 30% of the "savings" it achieved. For example, if AMPS recommended that Central Valley pay only $900 of a $1,000 medical bill, and Central Valley paid only $900, then Central Valley "saved" a total of $100. Central Valley kept $70, which represented 70% of the savings, while AMPS received the other $30. AMPS paid 7.5% of the savings to TBG for its help in administering the MBR plan. Central Valley has characterized this 7.5% as an unauthorized "kickback" from AMPS to TBG, which it claims was not specified in any of its contracts. Notably, though, Central Valley's contracts made clear that AMPS would receive 30% of any savings. And Central Valley's contract with TBG permitted TBG to collect additional fees from firms engaging in the MBR process, which included AMPS.

In 2016, Central Valley abandoned the MBR plan and adopted a Reference Based Reimbursement ("RBR") system. Rather than relying on a review of individual medical bills, the RBR plan utilized a "reference point" and established a "permitted payment level" of the reference point. For example, Central Valley's

-4-

plan provided for payment of 160% of Medicare prices on hospital and facility claims, but allowed the "claims delegate" to, "in its sole discretion," adjust payment upwards by 30% of the permitted payment level (i.e., pay up to 208% of the Medicare prices). The "claims delegate" was AMPS's subsidiary, defendant Claims Delegate Services, LLC ("CDS"). The plan also allowed Central Valley and CDS to jointly decide to pay as much of the medical bill as they believed appropriate.

The payment structure changed under the 2016 RBR plan. Under this plan, Central Valley paid CDS 12.5% of the gross billed charges. CDS split its 12.5% with TBG, keeping 10% for itself and paying the other 2.5% to TBG. So, for example, if a $100,000 medical bill was handled by the plan, Central Valley paid $12,500 to CDS, and CDS gave $2,500 to TBG. Central Valley claims the RBR payments suffered from two fundamental flaws: (1) CDS should have received only 10% of gross billed charges rather than the 12.5% it received; and (2) any "kickback" from CDS to TBG was unauthorized and improper.

Central Valley filed suit against the various defendants involved in marketing and administering the two health care plans. Central Valley took an expansive approach in stating its claims, bringing a number of ERISA claims against the defendants, alleging multiple breaches of fiduciary duties and alleging the defendants engaged in a number of prohibited transactions. Central Valley also brought a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., alleging the defendants engaged in a range of racketeering activity.

Central Valley amended its complaint three times; each amendment provided new details or shifted its legal theories. The RICO claim was dismissed fairly early in the litigation, when Central Valley agreed to dismiss the claim as a condition for leave to file its third amended complaint. Central Valley's ERISA claims did not survive summary judgment, as the district court granted summary judgment in favor

of the defendants on all claims. In addition, the court awarded attorney's fees to the defendants. Central Valley appeals the summary judgment and attorney's fees rulings.

## II. DISCUSSION

A grant of summary judgment is reviewed *de novo*. Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 643 (8th Cir. 2007). Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Johnson v. Metro. Life Ins. Co., 437 F.3d 809, 812–13 (8th Cir. 2006).

### A. Fiduciary Duties

For an ERISA plaintiff to state a claim against a defendant for breach of a fiduciary duty, the plaintiff must first establish the existence of a fiduciary relationship with the defendant. McCaffree Fin. Corp. v. Principal Life Ins. Co., 811 F.3d 998, 1002 (8th Cir. 2016). Central Valley concedes that, with one exception, no defendant was a denominated fiduciary under the plans. Rather, it claims the non-denominated defendants became de facto fiduciaries by their conduct.

Service providers involved in marketing or administering benefit plans under ERISA can become fiduciaries in three manners. 29 U.S.C. § 1002(21)(A). They may exercise discretionary authority or control over management of the plan or have authority or control over the disposition of the plan's assets. Id. They may "render[] investment advice" about plan assets "for a fee or other compensation." Id. Or they may have "discretionary authority or discretionary responsibility" over the plan's "administration." Id. The first and third alternatives are at issue here. The statute makes plain that exercising "[d]iscretion is the benchmark for fiduciary status under

-6-

ERISA." Johnston v. Paul Revere Life Ins. Co., 241 F.3d 623, 632 (8th Cir. 2001) (cleaned up). A service provider does not act with the "discretion" required to establish a fiduciary relationship if its actions (1) conform to specific contract terms, or (2) can be freely rejected by the plan sponsor. Rozo v. Principal Life Ins. Co., 949 F.3d 1071, 1074 (8th Cir. 2020). The district court concluded that only CDS had the requisite discretion to be a fiduciary, but that CDS breached no fiduciary duty. We agree.

### 1. 2015 MBR Plan

Central Valley asserts that, under the 2015 MBR plan, TBG and AMPS were fiduciaries because (1) TBG exercised control over plan assets when it made payments to providers; and (2) TBG and AMPS exercised control over plan assets when they expanded the claims subject to MBR review, thereby increasing their compensation. Central Valley's assertions are not supported by the evidence in the record.

TBG did not exercise control over plan assets when it made payments to providers because Central Valley retained possession and had dominion over all plan assets at all times, only granting TBG the authority to cut checks in the precise amount approved by Central Valley. In light of Central Valley's ability to "freely reject" any payment recommendation it received from TBG, no fiduciary relationship existed between TBG and Central Valley. Id. at 1073–74 (service provider is not a fiduciary if a plan can freely reject its actions); see also IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1419 (9th Cir. 1997) ("If a fiduciary tells a bookkeeping service to send a check for $950 to Mercy Hospital, the bookkeeping service does not thereby become a fiduciary.").

Similarly, TBG and AMPS did not exercise control over plan assets by making undisclosed "kickback" payments. The contracts between the parties disclosed the payments. AMPS was paid 30% of savings it achieved in administering the MBR plan under its contract with Central Valley. TBG's contract with Central Valley permitted TBG to collect additional fees from firms involved in the MBR process like AMPS. These disclosed "kickback" payments did not create a fiduciary relationship.

Central Valley's second argument also fails because TBG and AMPS did not possess the requisite discretion over the amount of compensation that they received to become fiduciaries. While TBG and AMPS could increase the number of claims that AMPS reviewed, that only had the potential to increase their compensation. It is true that by reviewing more bills AMPS would be able to make more recommendations to Central Valley, and could thereby potentially trigger more "savings" for Central Valley (which determined AMPS's compensation), but Central Valley still had to approve AMPS's recommendations. Thus, Central Valley ultimately decided what portion of each medical bill was paid. Because Central Valley made the final payment decisions, AMPS and TBG did not have discretion over their compensation and were not fiduciaries. See Rozo, 949 F.3d at 1073–74.[2]

### 2. 2016 RBR Plan

Central Valley asserts that TBG, AMPS, and CDS were fiduciaries because they exercised control over plan assets when they (1) decided and communicated about benefits claims; and (2) increased their compensation by charging unauthorized fees. Neither argument is persuasive.

---

[2] Central Valley also seeks to hold defendant GMS Benefits liable on the theory that it knowingly participated in TBG or AMPS's fiduciary duty breach. Because TBG and AMPS are not fiduciaries, this argument necessarily fails.

The record is plain that CDS exercised discretion in deciding some claims and was a fiduciary. CDS, however, was the only defendant with the ability to exercise this type of discretion. While TBG and AMPS communicated with both CDS and Central Valley about claims, that communication is insufficient to trigger a fiduciary duty unless it is coupled with discretionary control over the payment of claims. Here, the record does not support a finding that TBG and AMPS exercised discretion over the payment of claims, foreclosing the possibility of a fiduciary relationship. Id.

This leaves only the question of whether or not CDS breached its admitted fiduciary duties. In order for Central Valley to prevail, it must show that CDS violated a duty while acting in its role as a fiduciary. See, McCaffree Fin. Corp., 811 F.3d at 1002 ("[C]ourts assessing claims under ERISA must ask whether a person was acting as a fiduciary . . . when taking the action subject to complaint.") (cleaned up). Here, the breaches of fiduciary duties alleged by Central Valley are completely unrelated to CDS's role as a fiduciary. The fiduciary duties owed by CDS to Central Valley were limited to making benefit determinations on hospital and facility claims. Central Valley has not pointed to any breach of this duty; rather, the bulk of Central Valley's allegations are against non-fiduciary TBG. Because none of Central Valley's allegations pertain to CDS's fiduciary duty of making benefit determinations on hospital and facility claims, Central Valley's fiduciary duty claim against CDS fails.

Central Valley also asserts that TBG, AMPS, and CDS were fiduciaries because they exercised discretion over their compensation by charging unauthorized fees. Central Valley relies on the plan documents, which provided for payment to CDS in the amount of 10% of gross billed charges. Because CDS was paid 12.5% of gross billed charges, Central Valley asserts the "extra" 2.5% was the result of the defendants exercising their discretion to increase the fees. The record shows otherwise. The record supports the district court's finding that the 10% fee listed in the RBR plan was a "scrivener's error," allowing the court to fix the error. See, e.g.,

Young v. Verizon's Bell Atl. Cash Balance Plan, 615 F.3d 808, 817–23 (7th Cir. 2010) (amending ERISA plan to fix scrivener's error). The error contained in the RBR plan is apparent when the communications between the parties and the performance of the contract are examined. GMS Benefits provided a document listing the different plan options for 2016 to Central Valley that included the RBR fee as 12.5%. A later email between representatives at Central Valley and GMS Benefits confirmed that the RBR fee was 12.5%. The course of performance between the parties also supported a 12.5% fee, as Central Valley repeatedly made payments of 12.5% to CDS during the plan year. This course of conduct and communication makes plain that the parties agreed to a 12.5% fee. No defendant had discretion to set a higher fee, and no defendant set a higher fee. Because no defendant acted with discretion with respect to compensation, no defendant became a fiduciary.

## B. Prohibited Transactions

ERISA "regulates the conduct of plan fiduciaries, placing certain transactions outside the scope of their lawful authority." Lockheed Corp. v. Spink, 517 U.S. 882, 888 (1996); see also 29 U.S.C. § 1106. Before a plaintiff may establish a "prohibited transaction," it must first show that "a fiduciary caused the plan to engage in the allegedly unlawful transaction." Lockheed Corp., 517 U.S. at 888. Central Valley's claims against all non-CDS defendants necessarily fail, as no fiduciary relationship existed.

The prohibited transactions claims against CDS also fail because Central Valley does not explain how CDS engaged in any prohibited transaction in its role as a fiduciary. See McCaffree Fin. Corp., 811 F.3d at 1002. Central Valley improperly focuses on the 12.5% fee that it paid to CDS, and CDS's alleged 2.5% "kickback" to TBG. Because Central Valley's allegations have nothing to do with CDS's role as a fiduciary, this claim fails. In addition, we can find nothing "prohibited" about the transaction that Central Valley complains of when Central

-10-

Valley agreed to pay CDS a 12.5% fee, and Central Valley's contract with TBG allowed TBG to receive additional fees from various types of entities, including CDS.

### C. Attorney's Fees

Central Valley appeals the district court's award of attorney's fees to the defendants. An award of attorney's fees is reviewed for an abuse of discretion. Johnson v. Charps Welding & Fabricating, Inc., 950 F.3d 510, 525 (8th Cir. 2020). ERISA allows "either party," plaintiff or defendant, to recover attorney's fees. Id. (quoting 29 U.S.C. § 1132(g)(1)). In determining whether to award a party attorney's fees, a court should consider (1) the degree of culpability or bad faith assignable to the opposing party; (2) the ability of the opposing party to pay an award of attorney's fees; (3) the deterrent effect an award of attorney's fees would have on others acting under similar circumstances; (4) whether the party seeking fees sought to benefit plan participants and beneficiaries or to resolve legal issues specific to ERISA; and (5) the relative merits of the parties' positions. Lawrence v. Westerhaus, 749 F.2d 494, 495–96 (8th Cir. 1984) (per curiam).

Here, the district court properly balanced the Westerhaus factors and did not abuse its discretion in awarding defendants attorney's fees. The court found that the first, second, third, and fifth Westerhaus factors all supported an award of fees. As to the first and fifth factors, the court explained that Central Valley's "claims lacked merit from the beginning of the lawsuit," as "[t]he operative agreements and Plan documents, along with facts established before litigation, showed a lack of any evidence of breaches of fiduciary duties or prohibited transactions . . . ." The court went on to note that Central Valley chose to pursue its "meritless litigation in an almost haphazard fashion" over the course of years. As to the second factor, the court found that Central Valley has the ability to satisfy an award of attorney's fees, noting Central Valley's more than $1 billion in annual revenue, more than $500 million in assets, and its own attorney's fees of more than $1 million for this litigation. Finally,

-11-

as to the third factor, the district court noted that awarding attorney's fees to defendants could "deter plan administrators from engaging in wasteful litigation against processors who carry out their duties in good faith." We find no error in the court's analysis.

Central Valley also argues that the district court should not have awarded attorney's fees which were incurred defending against the RICO claim. According to Central Valley, such fees are not authorized under ERISA's attorney's fees provision. We need not decide the issue because Central Valley waived the argument below. While Central Valley filed a 62-page opposition to defendants' motions for attorney's fees in the district court, it never made a specific RICO argument. Nor has it identified which fees it believes are attributable to the RICO claim. Central Valley cannot successfully make this new, undeveloped argument for the first time on appeal. See, Eagle Tech. v. Expander Ams., Inc., 783 F.3d 1131, 1139 (8th Cir. 2015) (argument raised for the first time on appeal waived); Aaron v. Target Corp., 357 F.3d 768, 779 (8th Cir. 2004) (same).

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of defendants and its award of attorney's fees to defendants.

_____