07-2537-cv
Daniel Goldstein v. George Pataki

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

Argued: October 9, 2007                    Decided: February 1, 2008

Docket No. 07-2537-cv

_____

DANIEL GOLDSTEIN, JERRY CAMPBELL, as the putative administrator of the estate of Oliver St. Clair Stewart and in his individual capacity, GELIN GROUP, LLC, CHADDERTON'S BAR AND GRILL, INC., d/b/a Freddy's Bar and Backroom, MARIA GONZALEZ, JACKIE GONZALEZ, YESENIA GONZALEZ, HUDA MUFLEH-ODEH, JAN AKHTAR, DAVID SHEETS, PETER WILLIAMS ENTERPRISES, INC., 535 CARLTON AVE. REALTY CORP., PACIFIC CARLTON DEVELOPMENT CORP., AARON PILLER, and ROCKWELL PROPERTY MANAGEMENT, LLC,

*Plaintiffs-Appellants,*

—v.—

GOVERNOR GEORGE E. PATAKI, NEW YORK STATE URBAN DEVELOPMENT CORPORATION, d/b/a Empire State Development Corporation, BRUCE C. RATNER, JAMES P. STUCKEY, FOREST CITY ENTERPRISES, INC., FOREST CITY RATNER COMPANY, RATNER GROUP, INC., BR FCRC, LLC, BR LAND, LLC, FCR LAND, LLC, BROOKLYN ARENA, LLC, ATLANTIC YARDS DEVELOPMENT COMPANY, LLC, MICHAEL BLOOMBERG, DANIEL DOCTOROFF, ANDREW M. ALPER, JOSHUA SIREFMAN, CITY OF NEW YORK, NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION, EMPIRE STATE DEVELOPMENT CORPORATION, and CHARLES A. GARGANO,

*Defendants-Appellees.*

_____

B e f o r e :
JACOBS, *Chief Judge*, KATZMANN and LIVINGSTON, *Circuit Judges.**

_____

* The Honorable Edward R. Korman of the Eastern District of New York, originally a member of this panel sitting by designation, recused himself following oral argument and had no role in the preparation of this decision. Accordingly, Chief Judge Dennis Jacobs was appointed as the

_____

Appeal from a judgment of the United States District Court for the Eastern District of New York (Garaufis, *J.*) granting defendants' motion to dismiss the complaint.

_____

FOR PLAINTIFFS-APPELLANTS:    MATTHEW D. BRINCKERHOFF (Andrew G. Celli, Jr., Eric Hecker., *of counsel*) Emery Celli Brinckerhoff & Abady LLP New York, NY

Jennifer Levy
South Brooklyn Legal Services,
Brooklyn, NY

FOR DEFENDANTS-APPELLEES:    PREETA D. BANSAL (Douglas M. Kraus, *of counsel*) Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY (on behalf of the Empire State Development Corporation appellees)

Laura R. Johnson, Assistant Solicitor General, Barbara D. Underwood, Solicitor General, Benjamin N. Gutman, Deputy Solicitor General *for* Andrew M. Cuomo, Attorney General of the State of New York, New York, NY (on behalf of the New York State appellees)

Jeffrey R. Braun, Karen L. Mintzer, Kerri B. Folb, Jessica J. Glass, Kramer Levin Naftalis & Frankel LLP, Richard G. Leland, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY (on behalf of the Forest City Ratner appellees)

Jane L. Gordon, Edward F.X. Hart *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY (on behalf of the New York City appellees)

_____

KATZMANN, Circuit Judge:

_____

third member of the panel pursuant to interim Local Rule § 0.14(b). At the time he was added to the panel, Judge Jacobs was furnished with a transcript and audio recording of oral argument as well as the briefs and the record on appeal.

Few powers of government have as immediate and intrusive an impact on the lives of citizens as the power of eminent domain. For affected property owners, monetary compensation may understandably seem an imperfect substitute for the hardships of dislocation and the loss of a home or business. But federal judges may not intervene in such matters simply on the basis of our sympathies. Just as eminent domain has its costs, it has its benefits, and in all but the most extreme cases, Supreme Court precedent requires us to leave questions of how to balance the two to the elected representatives of government, notwithstanding the hardships felt by those whose property is slated for condemnation.

Against this backdrop, we must decide if a complaint has sufficiently alleged that an eminent domain action violates the Public Use Clause of the Fifth Amendment. In our view, the plaintiffs-appellants effectively acknowledge, albeit reluctantly, that the well-publicized, multi-billion dollar development project they challenge would result, *inter alia*, in a new stadium for the New Jersey Nets, a public open space, the creation of affordable housing units and the redevelopment of an area in downtown Brooklyn afflicted for decades with substantial blight. They contend, however, that the project's public benefits are serving as a "pretext" that masks its actual raison d'être: enriching the private individual who proposed it and stands to profit most from its completion. Following Supreme Court precedent, we conclude that the plaintiffs have not mounted a viable Fifth Amendment challenge. The judgment of the district court is affirmed.

**I.**

Because this appeal follows the grant of a motion to dismiss, we must derive our version of the facts of record, including our description of the Atlantic Yards Project, from the allegations set forth in the plaintiffs' Amended Complaint, "taking [them] as true . . . and

3

drawing all reasonable inferences in favor of the plaintiff[s]." *Stuto v. Fleishman*, 164 F.3d 820, 824 (2d Cir. 1999).[1]

The Atlantic Yards Arena and Redevelopment Project (the "Atlantic Yards Project" or the "Project") is a publicly subsidized development project set to cover twenty-two acres in and around the Metropolitan Transit Authority's Vanderbilt Yards, an area in the heart of downtown Brooklyn, New York. The plan for the Project, which will be designed in part by the architect Frank Gehry, includes the construction of a sports arena that will play home to the National Basketball Association franchise currently known as the New Jersey Nets, no fewer than sixteen high-rise apartment towers, and several office towers. The Project site is bounded generally by Dean Street, Atlantic Avenue, Fourth Avenue, and Vanderbilt Avenue.

Announced to the public in December 2003, the Project is being carried out, in part, through the assistance of the New York State Urban Development Corporation, which also operates as the Empire State Development Corporation ("ESDC"), a public-benefit corporation and political subdivision of New York State. The involvement of the ESDC is critical. Although approximately half the proposed footprint for the Project lies within the Atlantic Terminal Urban Renewal Area ("Renewal Area"), a heavily blighted area owned in part by the Metropolitan Transit Authority ("MTA"), the Project site also includes an adjacent parcel of land with less blight (referred to in the complaint as the "Takings Area") that is currently held by private parties. Under the plan for the Project, the ESDC, if necessary, will acquire the rest of

---

[1] Additionally, in assessing this motion, we may consider the "'documents plaintiffs had either in [their] possession or had knowledge of and upon which they relied in bringing suit.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

the privately held land in the Takings Area through the use of eminent domain.

Consistent with the strictures of New York's Eminent Domain Procedure Law, the ESDC held a public hearing, which it publicized in advance, on August 23, 2006, at which it discussed the proposal for the Project in detail. *See* N.Y. Em. Dom. Proc. Law § 202. Thereafter, in September 2006, members of the public were invited to attend a community forum on the Project where they could voice their concerns.

## II.

Plaintiffs-appellants are fifteen property owners whose homes and businesses in the Takings Area are slated for condemnation to make way for the Project. In October 2006, they filed this action in the Eastern District of New York, naming as defendants Appellee Bruce Ratner, the private developer carrying out the Project, several entities affiliated with him (collectively, the "Forest City Ratner Appellees" or "Ratner Group") and various officials, agencies, and subdivisions of New York State and New York City (respectively, the "State Appellees" and "City Appellees").[2] The action was assigned to the Hon. Nicholas G. Garaufis.

Apparently, after being consolidated, this action represented the first challenge in federal court to the Atlantic Yards Project. The original complaint raised three federal-law claims, asserting that the use of eminent domain in furtherance of the Project would violate the "Public Use" Clause of the Fifth Amendment, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Thereafter, the plaintiffs amended the complaint, asserting the same

---

[2] Defendants initially took the position that these claims were not ripe for adjudication, On appeal, however, they concede the ripeness issue because the condemnation process is much further along than it was at the filing of this action. As we have been given every indication that the takings at issue are imminent, we do not address ripeness.

5

three federal-law causes of action against all defendants, and adding a cause of action under New York state law against defendant ESDC.

Each of the claims relies on slightly different allegations.[3] The heart of the complaint, however, and the centerpiece of the instant appeal, is its far-reaching allegation that the Project, from its very inception, has not been driven by legitimate concern for the public benefit on the part of the relevant government officials. Appellants contend that a "substantial" motivation of the various state and local government officials who approved or acquiesced in the approval of the Project has been to benefit Bruce Ratner, the man whose company first proposed it and who serves as the Project's primary developer. Ratner is also the principal owner of the New Jersey Nets. In short, the plaintiffs argue that all of the "public uses" the defendants have advanced for the Project are pretexts for a private taking that violates the Fifth Amendment.

The defendants timely moved to dismiss all the claims on various grounds, among them that the complaint failed to state a claim upon which relief could be granted. *See* Fed. R. Civ. P.

---

[3] In support of the first cause of action, under 42 U.S.C. § 1983, the plaintiffs alleged that the defendants violated their Fifth Amendment rights by using the power of eminent domain where the "claims of public benefit are a pretext." The plaintiffs specifically allege in support of this claim that the "public does not benefit from the taking of plaintiff's properties" and "[a]lternatively . . . any benefit from the taking of plaintiffs' properties . . . is secondary and incidental to the benefit that inures to [the Ratner Group]" because the "desire to confer a private benefit to [the Ratner Group] was a substantial, motivating factor, in defendants' decision to seize plaintiffs' property and transfer it to [the Ratner Group]." The second cause of action rests on the claim that the defendants have violated the Equal Protection Clause by "[e]levating the status of one citizen or group of citizens" (namely, the Ratner defendants) and by "singling out plaintiffs, for unequal, adverse[] treatment" without a rational basis. The third cause of action alleges primarily that, in circumventing the local review process (and instead working at the state level with the ESDC), plaintiffs violated defendants' procedural due process rights. The fourth cause of action–whose dismissal without prejudice is not challenged unless we reinstate one or more of the federal claims–alleges various violations of N.Y. Em. Dom. Proc. Law § 207 as against defendant ESDC.

6

12(b)(6). Magistrate Judge Robert Levy, to whom the Rule 12 motion practice was referred, issued a Report and Recommendation ("R&R") recommending that the district court abstain from deciding the issue under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). *See Goldstein v. Pataki*, 2007 WL 1695573 (E.D.N.Y. Feb. 23, 2007). After objections were filed, Judge Garaufis rejected this aspect of the R&R, and, instead, dismissed the federal claims in the amended complaint with prejudice. *See Goldstein v. Pataki*, 488 F. Supp. 2d 254 (E.D.N.Y. 2007). In a ruling that is not challenged on appeal, the district court declined to retain supplemental jurisdiction over the state claim, dismissing it without prejudice.

With respect to the claim made under the Public Use Clause, the district court concluded, after a thorough and careful analysis, that no such claim was available. By the plaintiffs' own admission, the court noted, the Project here would serve several well-established public uses such as the redress of blight, the construction of a sporting arena, and the creation of new housing, including 2,250 new units of affordable housing. *Id.* at 286-87. The district court additionally held that a "pretext" argument provided a valid basis for a public-use challenge under the Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005), but was not available here because "even if Plaintiffs could prove every allegation in the Amended Complaint, a reasonable juror would not be able to conclude that the public purposes offered in support of the Project [were] 'mere pretexts' within the meaning of *Kelo*." *Id.* at 288. As to the plaintiffs' equal-protection claim, the district court determined that it was not viable because, *inter alia*, any distinction between the plaintiffs and other persons has a rational basis. *Id.* at 291. As to the plaintiffs' due process claim, the district court held that such a claim was ill-fated in view of our holding in *Brody v. Village of Port Chester*, 434 F.3d 121 (2d Cir. 2005), in which

7

we determined that section 207 of New York's Eminent Domain Procedure Law was sufficient to satisfy the requirements of due process. *Id.* This appeal followed.

## III.

The primary contentions raised on appeal are that the district court overlooked substantial and specific allegations that Ratner is the sole beneficiary of the Project and that the public uses invoked by appellees are "pretexts" advanced by corrupt and coopted state officials. (Appellants also press their equal protection and due process claims, but give these appropriately short discussion.) The following passage from the appellants' brief captures the essence of their argument:

> Defendants' decision to take Plaintiffs' properties serves only one purpose: it allows Ratner to build a Project of unprecedented size, and thus reap a profit that Defendants, tellingly, have attempted to conceal at every turn. This is not merely favoritism of a particular developer . . . . Here, the "favored" developer is driving and dictating the process, with government officials at all levels obediently falling into line. . . . The imminent seizure of Plaintiffs' properties in the Takings Area selected by Ratner has been accomplished through a wholesale abdication of governmental responsibility . . . . That abdication has allowed Ratner to co-opt the power of eminent domain; and to wield it in service of his understandable desire to expand the Project to truly mammoth proportions, thus increasing the profit to himself, his companies and his shareholders.

Although the claim is far-reaching, the specific allegations underlying it are less so. Almost without exception, the appellants' arguments can be grouped into one of five discrete categories. First, the appellants point to a series of allegations that follow logically from the acknowledged fact that Ratner was the impetus behind the Project, *i.e.*, that he, not a state agency, first conceived of developing Atlantic Yards, that the Ratner Group proposed the geographic boundaries of the Project, and that it was his plan for the Project that the ESDC eventually adopted without significant modification. Second, the appellants emphasize certain allegations that relate not to the passage of the Project, but to some purported departures from convention in

8

the process through which the MTA (which is not a defendant in this case) accepted a bid from the Ratner Group to develop land owned principally by the MTA. Third, certain allegations are invoked to suggest that the public uses being proffered by appellees (and relied upon by the district court) were *post hoc* justifications, for example, the charge in the appellants' brief that "Defendants never claimed that the Takings Area was blighted until years after the Project was officially announced and *Kelo* had been decided." Fourth, while conceding that the ESDC has at all times abided by the letter of the strict requirements of state law, the appellants make various conclusory allegations in the complaint to suggest that the ESDC has nonetheless violated the spirit of these rules, to wit, that the "ESDC . . . engaged in a sham 'public' review process whose outcome was predetermined long before." Finally, the appellants make reference to several lawsuits that have been filed in state court in connection with this Project, but do not claim that any of those lawsuits addressed the issue of whether the public use of the Project was pretextual, which is the gravamen of the primary claim here.

## IV.

We review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In setting forth the pleading standard for this cause of action, the district court looked for guidance to the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), which disavowed the oft-quoted statement from *Conley v. Gibson*, 355 U.S. 41 (1957), that "'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief.'" 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46). *Twombly* requires instead that the complaint's "[f]actual allegations be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* at 1965 (internal citation omitted).

Because the disavowed language in *Conley* had been a part of our court's jurisprudence for decades, "'[c]onsiderable uncertainty' surrounds the breadth of the . . . decision." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 155 (2d Cir. 2007)). The appellants concede on appeal that *Twombly* applies to the pleading standard in their action. Even though the precedents in this area "are less than crystal clear," *see Iqbal*, 490 F.3d at 178 (Cabranes, J., concurring), we need not take this occasion to contemplate the outer limits of the *Twombly* standard. As all parties acknowledge, at a bare minimum, the operative standard requires the "plaintiff [to] provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 165). In view of what they have effectively conceded in prosecuting this lawsuit, the appellants cannot meet this standard.

## V.

We have recognized that the power of eminent domain is "a fundamental and necessary attribute of sovereignty, superior to all private property rights." *Rosenthal & Rosenthal, Inc. v. New York State Urban Dev. Corp.*, 771 F.2d 44, 45 (2d Cir. 1985) (per curiam) (citing *Georgia v. City of Chattanooga,* 264 U.S. 472, 480 (1924) and *Albert Hanson Lumber Co. v. United States*, 261 U.S. 581, 597 (1923)). But as the Fifth Amendment ensures, this power is not

10

without limits, among them what has come to be known as the public-use requirement.[4]  Among its crucial protections, the Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  This language has long been understood to guarantee that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid."  *Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55, 80 (1937); *see also Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.").

But both in doctrine and in practice, the primary mechanism for enforcing the public-use requirement has been the accountability of political officials to the electorate, not the scrutiny of the federal courts.  Over the last century, reflecting the direction of Supreme Court case law, federal courts have had a much greater role in addressing what type of governmental action constitutes a taking and what level of compensation is just, leaving to legislatures to determine, in all but the most extreme cases, whether a taking fulfills the public-use requirement.  *See generally* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 803-10 (1995); Vicki Been, *"Exit" as a Constraint on Land Use Exactions:  Rethinking the Unconstitutional Conditions Doctrine*, 91 Colum. L. Rev. 473, 497 (1991).  "There is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, even when the eminent domain power is equated with

---

[4] This public-use requirement has been made applicable to the states through the Fourteenth Amendment.  *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 163-64 (1998).

the police power," *Midkiff*, 467 U.S. at 240, but the Supreme Court has repeatedly "made clear that it is 'an extremely narrow' one." *Id.* (quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954)).

Speaking for a unanimous Supreme Court in *Midkiff*, Justice O'Connor explained the rationale behind the very limited scope of federal judicial review in this area:

> Judicial deference is required because, in our system of government, legislatures are better able to assess what public purposes should be advanced by an exercise of the taking power. State legislatures are as capable as Congress of making such determinations within their respective spheres of authority. Thus, if a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.

467 U.S. at 244 (internal citation omitted). The Supreme Court has therefore instructed lower courts not to "substitute [their] judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" *Id.* at 241 (quoting *United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668, 680 (1896)); *see also Kelo v. City of New London*, 545 U.S. 469, 480 (2005) ("Without exception, our cases have defined [public use] broadly, reflecting our longstanding policy of deference to legislative judgments in this field."); *Berman*, 348 U.S. at 32 ("[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."). To that end, we have said that our review of a legislature's public-use determination is limited such that "'where the exercise of the eminent domain power is rationally related to a conceivable public purpose,' . . . the compensated taking of private property for urban renewal or community redevelopment is not proscribed by the Constitution." *Rosenthal*, 771 F.2d at 46 (quoting *Midkiff*, 467 U.S. at 241).

By way of brief illustration, in *Berman*, the Supreme Court rejected a Fifth Amendment challenge from the owner of a department store slated for condemnation as part of a larger redevelopment plan targeting blight in Washington, D.C. 348 U.S. at 31. The owner argued that

12

because his particular store was not blighted, and his land would be transferred to a private developer, the taking violated the Public Use Clause. The Supreme Court disagreed, reasoning that "[o]nce the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." *Id.* at 35-36. In *Rosenthal*, applying *Berman*, we reached a similar result when we rejected a challenge to a plan redressing "the physical, social and economic blight that ha[d] afflicted the Times Square area of Manhattan" in spite of the fact that the private developer who had been selected to acquire the land in connection with the project was allegedly connected to then New York City Mayor Edward Koch. 771 F.2d at 45; *see also Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp.*, 605 F. Supp. 612, 616 (S.D.N.Y. 1985).

With echoes of *Rosenthal*, the instant complaint calls the "alleged 'public benefits' . . . either wildly exaggerated or simply false. At best, [they] are incidental; at worst, they are non-existent." Read carefully, however, the specific allegations in the complaint foreclose any blanket suggestion that the Project can be expected to result in no benefits to the public. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (noting that "conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint"). Instead, their collective import is that the costs involved, measured in terms of either government spending or the impact the Project will have on the character of the neighborhood and its current residents, will dwarf whatever benefits result.

In other words, the appellants have effectively conceded what *Rosenthal* found to have been a complete defense to a public-use challenge: that viewed objectively, the Project bears at

13

least a rational relationship to several well-established categories of public uses, among them the redress of blight, the creation of affordable housing, the creation of a public open space, and various mass-transit improvements. But the plaintiffs then expend considerable effort explaining why these proffered public uses should nonetheless be rejected as "pretextual," not because they are false, but because they are not the real reason for the Project's approval.[5]

For example, on the subject of whether the Project will redress blight, the complaint alleges that this is a "pretext with no basis in fact," explaining that "far from being 'blighted,' the Takings Area [as distinct from the Renewal Area] rests smack in the middle of some of the most valuable real estate in Brooklyn." But the complaint does not allege, nor could it, that either the Renewal Area or the Takings Area are devoid of blight. The claim made is that the "City of New York . . . never declared that the Takings Area [as opposed to the Renewal Area] was 'blighted' and . . . never designated it for redevelopment" until three years after the project was announced, an implicit acknowledgment of the fact that the Renewal Area, which makes up "[n]early half" of the Project site, was first designated as blighted in 1968, a designation that has since been reaffirmed by New York City ten times, most recently in 2004. By the same token, although alleging that none of their own properties are blighted, the plaintiffs have conceded that even within the Takings Area, many properties are blighted and that the Project, as a whole, targets an area more than half of which is significantly blighted. The blight study commissioned by ESDC in 2006 determined that the conditions of blight extended well into the Takings Area, and the complaint alleges no facts to the contrary. The study concluded that "the non-rail yard

---

[5]The Complaint does not address the public open space rationale or the improvements to mass transit, nor does it in any way suggest that the Project will not include a stadium.

14

portion of the project site is characterized by unsanitary and substandard conditions including vacant and underutilized buildings, vacant lots, irregularly shaped lots, building facades that are in ill-repair (e.g., crumbling brickwork, graffiti, flaking paint), and structures suffering from serious physical deterioration."

As to the issue of affordable housing, the complaint contends that "[f]undamentally, the Project is comprised of luxury housing" because 69% of the housing units will be "market rate, luxury units" and the remaining units will, for the most part, be introduced as part of the second phase of development, which is not guaranteed. But the complaint concedes in the ensuing allegations that at least 550 below-market units (roughly 5% of the total number of units proposed) are slated to be built in the first phase of development, and that roughly three times that number are slated for the next phase.[6] Viewed carefully, the plaintiffs' contention is not that the Project will result in no below-market housing, but that when viewed "from the perspective of [potential] residents' income, the affordable [housing] units proposed from the Project will not remotely offset the impact of the luxury housing."

We need not go further. As *Berman* and *Rosenthal* illustrate, the redevelopment of a blighted area, even standing alone, represents a "classic example of a taking for a public use." *Rosenthal*, 771 F.2d at 46; *see also Kelo*, 545 U.S. at 483-84. Nor does it matter that New York has enlisted the services of a private developer to execute such improvements and implement its development plan. Once we discern a valid public use to which the project is rationally related, it "makes no difference that the property will be transferred to private developers, for the power

---

[6] The "affordable housing" discussed here refers to below-market housing for middle class occupants, not subsidized housing for the poor. No units are slated for households with incomes below $21,000.

15

of eminent domain is merely the means to the end." *Rosenthal*, 771 F2d at 46.

Similarly, we are without authority to provide the appellants the relief they seek based on the fact that their individual lots are not blighted, notwithstanding the understandable frustration this must cause them. The appellants do not dispute the presence of significant blight in the Takings Area and even greater blight in the adjacent Renewal Area. "[O]nce it has been shown that the surrounding area is blighted, the state may condemn unblighted parcels as part of an overall plan to improve a blighted area.*" In re G. & A. Books, Inc.*, 770 F.2d 288, 297 (2d Cir. 1985). This is "because 'community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis–lot by lot, building by building.'" *Rosenthal*, 771 F.2d. at 46 (quoting *Berman*, 348 U.S. at 35). The public-use requirement will be satisfied as long as the purpose involves "developing [a blighted] area to create conditions that would prevent a reversion to blight in the future." *Kelo,* 545 U.S. at 484 n.13 (emphasis omitted).

Lastly on this point, we must reject the argument that the ESDC is undeserving of such deference because it is merely a state agency deputized by the legislature. The Supreme Court has expressly extended deference in such matters to both "Congress and its authorized agencies." *Berman*, 348 U.S. at 33. In this context, "State legislatures are as capable as Congress of making such determinations within their respective spheres of authority." *Midkiff*, 467 U.S. at 244. Indeed, *Midkiff* suggested it would be "ironic" if "state legislation [were] subject to greater scrutiny under the incorporated 'public use' requirement than is congressional legislation under the express mandate of the Fifth Amendment." *Id.* at 244 n.7. Nor do we see why it is relevant to the constitutional analysis that the ESDC, which in any case is not the only participant in this

16

story, is organized under state law as a public-benefit corporation.[7] *See* N.Y. Unconsol. Law§

6254(1) (McKinney 2007) (providing that the ESDC "shall be a corporate governmental agency

of the state, constituting a political subdivision and public benefit corporation").

## VI.

Because it correctly rejected, on the basis of the complaint and the documents referenced

therein, the argument that the Project was not rationally related to a public use, the district court

concluded that the appellant's claim would have necessarily failed under the precedents

established in *Berman* and *Midkiff*. But the district court's analysis did not end there because it

determined that *Kelo* opened up a separate avenue for a takings challenge under which a plaintiff

could claim a taking had been effectuated "'under the mere pretext of a public purpose, when

[the] actual purpose was to bestow a private benefit.'" *Goldstein*, 488 F. Supp. 2d at 282

(quoting *Kelo*, 545 U.S. at 478).

Primarily underlying this claim is a passing reference to "pretext" in the *Kelo* majority

opinion in a single sentence. *See id.* at 478 ("Nor would the City be allowed to take property

under the mere pretext of a public purpose when its actual purpose was to bestow a private

benefit."). Fortunately, the Supreme Court's guidance in *Kelo* need not be interpreted in a

vacuum. *Kelo* posed a novel question of law precisely because the City of New London had "not

[been] confronted with the need to remove blight." *Id.* at 482. The Supreme Court granted

certiorari on the limited question of "whether a city's decision to take property for the purpose of

---

[7] We also take judicial notice of the fact that on December 21, 2006, the New York State Public Authorities Control Board (a body that included then Governor George Pataki, the Speaker of the State Assembly, and the Majority Leader of the State Senate) issued a resolution approving of the Atlantic Yards Project. *See* Fed. R. Evid. 201.

17

economic development satisfies the 'public use' requirement of the Fifth Amendment." *Id.* at 477. Accordingly, the issue of pretext must be understood in light of both the holding of the case, which, in permitting a taking solely on the basis of an economic development rationale, reaffirmed the "longstanding policy of deference to legislative judgments in this field," *id.* at 480, as well as the decision's self-identification with a tradition of public use jurisprudence that "[f]or more than a century . . . has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Id.* at 483.[8]

Prior to *Kelo*, no Supreme Court decision had endorsed the notion of a "pretext" claim, although a few lower court cases contained language suggesting that a pretextual public use may be invalid. *See, e.g.*, *99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F. Supp. 2d 1123, 1129 (C.D. Cal. 2001) ("No judicial deference is required . . . where the ostensible public use is demonstrably pretextual"), *appeal dismissed as moot*, 60 F.App'x 123 (9th Cir. 2003); *Aaron v. Target Corp.*, 269 F. Supp. 2d 1162, 1177 (E.D. Mo. 2003) (same), *rev'd on other grounds*, 357 F.3d 768 (8th Cir. 2004); *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1229 (C.D. Cal. 2002) (same). *But see Montgomery v. Carter County*,

---

[8] We find it instructive that Justice O'Connor, in a dissent that was joined by three other Justices, maintained that the result reached by the majority represented a "mov[e] away from our decisions sanctioning the condemnation of harmful property use," contending that the Court's precedents stood only for the more limited proposition that "[b]ecause each taking *directly* achieved a public benefit, it did not matter that the property was turned over to private use." *Kelo*, 545 U.S. at 500-01 (O'Connor, J., dissenting). Justice O'Connor therefore agreed without reservation that, in addition to redressing blight, the "sovereign may transfer private property to private parties . . . who make the property available for the public's use–such as with a *railroad*, a public utility, or a *stadium*." *Id.* at 498 (emphasis added). As such, the instant challenge to the Project hinges on a proposition of law that would appear to fare no better under the *Kelo* dissent.

18

*Tenn.*, 226 F.3d 758, 765-66 (6th Cir. 2000) (observing that "[v]ery few takings will fail to satisfy that standard [and] the examples suggested in the reported cases tend to be highly implausible hypotheticals"). These claims have come in all shapes and sizes. *See Cottonwood Christian Ctr.*, 218 F. Supp. 2d at 1228 (challenging taking where the "evidence does not necessarily support a finding of blight"); *99 Cents Only Stores*, 237 F. Supp. 2d at 1130 (challenging taking premised on the assumption that the departure of Costco would result in future blight); *Aaron*, 269 F. Supp. 2d at 1174-75 (entertaining claim of pretext where the requisite "findings of blight rested in part on the condition of [the beneficiary's own] personal property, and on the substandard condition of property [the beneficiary] was obligated to maintain under the various leases"). Tellingly, it appears that in each of these district court cases, the plaintiff had contested whether *any* public use would be served by the taking.[9]

In contrast, the particular kind of "pretext" claim the plaintiffs in this case advance bears an especially dubious jurisprudential pedigree: The plaintiffs have effectively acknowledged the Project's rational relationship to numerous well-established public uses, but contend that it is constitutionally impermissible nonetheless because one or more of the government officials who approved it was actually–and improperly–motivated by a desire to confer a private benefit on

---

[9] In *99 Cents Only Stores*, for example, the challenged taking had been justified not by reference to any existing blight, but by a professed concern for "future blight" that the court found may not qualify as a valid public use. *See* 237 F. Supp. 2d at 1130. Similarly, in *Cottonwood Christian Center*, the district court concluded that the "evidence does not necessarily support a finding of blight." *See* 218 F. Supp. 2d at 1228. In *Aaron v. Target*, the challenged development plan was proposed by Target to acquire its leases from its landlord. 269 F. Supp. 2d at 1175. The district court noted, *inter alia*, the suspicious timing of the blight study and the fact that the purported "findings of blight rested in part on the condition of Target's personal property, and on the substandard condition of property Target itself was obligated to maintain under the various leases." *Id.* at 1174-75.

19

Mr. Ratner. The allegations in support of this claim primarily involve purported excesses in the costs of the plan as measured against its benefits. The appellants seek to use these alleged failings to gain discovery into the process by which the ESDC approved this Project. Among other things, as was made clear at oral argument, they seek depositions of pertinent government officials, along with their emails, confidential communications, and other pre-decisional documents. They also dispute various plausible assumptions underlying the Project's budget.

Allowing such a claim to go forward, founded only on mere suspicion, would add an unprecedented level of intrusion into the process. *See Kelo*, 545 U.S. at 488 (remarking that the "disadvantages of a heightened form of review are especially pronounced in this type of case. Orderly implementation of a comprehensive redevelopment plan obviously requires that the legal rights of all interested parties be established before new construction can be commenced."). Prior to *Kelo*, it was well settled that "it is only the taking's purpose, and not its mechanics that must pass scrutiny under the Public Use Clause." *Midkiff*, 467 U.S. at 244.

Accordingly, we must reject the notion that, in a single sentence, the *Kelo* majority sought *sub silentio* to overrule *Berman*, *Midkiff*, and over a century of precedent and to require federal courts in all cases to give close scrutiny to the mechanics of a taking rationally related to a classic public use as a means to gauge the purity of the motives of the various government officials who approved it. *See Kelo*, 545 U.S. at 483 (characterizing more than a century of Public Use Clause jurisprudence as having "wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power"); *Midkiff*, 467 U.S. at 241 ("[W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a

20

compensated taking to be proscribed by the Public Use Clause."); *Berman*, 348 U.S. at 32 ("The role of the judiciary in determining whether [the takings] power is being exercised for a public purpose is an extremely narrow one"); *United States ex rel. Tenn. Valley Auth. v. Welch*, 327 U.S. 546, 552 (1946) ("Any departure from this judicial restraint would result in courts deciding on what is and is not a governmental function . . . a practice which has proved impracticable in other fields."); *Old Dominion Land Co. v. United States,* 269 U.S. 55, 66 (1925); ("[T]he declaration by Congress of what it had in mind . . . . is entitled to deference until it is shown to involve an impossibility."); *United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668, 680 (1896) ("[W]hen the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation."); *cf. Franco v. Nat'l Capital Revitalization Corp.*, 930 A.2d 160, 171 (D.C. 2007) (recognizing that in this context, courts must be "especially careful not to indulge baseless, conclusory allegations that the legislature acted improperly").

We do not read *Kelo*'s reference to "pretext" as demanding, as the appellants would apparently have it, a full judicial inquiry into the subjective motivation of every official who supported the Project, an exercise as fraught with conceptual and practical difficulties as with state-sovereignty and separation-of-power concerns. Beyond being conclusory, the claim that the "decision to take Plaintiffs' properties serves only one purpose" defies both logic and experience. "Legislative decisions to invoke the power to condemn are by their nature political accommodations of competing concerns." *Brody v. Vill. of Port Chester*, 434 F.3d 121, 136 (2d Cir. 2005). And as Justice Scalia observed in words, if anything, more pertinent in this case:

> [W]hile it is possible to discern the objective "purpose" of a statute (i.e., the public good at which its provisions appear to be directed) . . . . discerning the subjective motivation of

21

[a legislative body] is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed even finite. . . . To look for *the sole purpose* of even a single legislator is probably to look for something that does not exist.

*Edwards v. Aguillard*, 482 U.S. 578, 636-37 (1987) (Scalia, J., dissenting) (emphasis in original). Thus, while "a legislature may juggle many policy considerations in deciding whether to condemn private property," the task of a federal court reviewing the constitutionality of such a taking should be one of "patrolling the borders" of this decision, viewed objectively, not second-guessing every detail in search of some illicit improper motivation. *See Brody*, 434 F.3d at 135.

We reach this conclusion preserving the possibility that a fact pattern may one day arise in which the circumstances of the approval process so greatly undermine the basic legitimacy of the outcome reached that a closer *objective* scrutiny of the justification being offered is required. In this area, "hypothetical cases . . . can be confronted if and when they arise." *Kelo*, 545 U.S. at 487; *see also id.* at 487 n.19. But we hold today that where, as here, a redevelopment plan is justified in reference to several classic public uses whose objective basis is not in doubt, we must continue to adhere to the *Midkiff* standard, *i.e.*, that the Atlantic Yards Project:

> may not be successful in achieving its intended goals. But 'whether *in fact* the [Project] will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if . . . the . . . [state] *rationally could have believed* that the [taking] would promote its objective.'

*Midkiff*, 467 U.S. at 242 (quoting *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 671-672 (1981) (emphasis in *Midkiff*)).

The appellants urge that we reach a contrary result because, unlike in *Kelo*, the Atlantic Yards Project was allegedly proposed in the first instance by Ratner himself. The sequence of events was certainly one of the factors considered in *Kelo*. However, here, New York long ago

decided by statute not to restrict the ESDC's mandate to those "projects in which it is the prime mover." *E. Thirteenth St. Cmty. Ass'n v. N.Y. State Hous. Fin. Agency*, 630 N.Y.S.2d 517, 518 (App. Div. 1995); *see also* N.Y. Unconsol. Law § 6252 (McKinney 2007) (providing the ESDC should "encourag[e] maximum participation by the private sector of the economy"). And as *Kelo* reaffirmed, the mere fact that a private party stands to benefit from a proposed taking does not suggest its purpose is invalid because "[q]uite simply, the government's pursuit of a public purpose will often benefit individual private parties." *Kelo*, 545 U.S. at 485.

Moreover, in this case, substantial factors not present in *Kelo* support our result.[10] As we have already illustrated, private economic development is neither the sole, nor the primary asserted justification for the Atlantic Yards Project. The appellants have conceded, if only reluctantly, that the Atlantic Yards Project will target a long-blighted area, result in the construction of a publicly owned (albeit generously leased) stadium, create a public open space, increase the quantity of affordable housing, and render various improvements to the mass transit

---

[10] Justice Kennedy, who joined with the majority opinion, nonetheless wrote separately to state his view that a "court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit, though with the presumption that the government's actions were reasonable and intended to serve a public purpose." *Kelo*, 545 U.S. at 491 (Kennedy, J., concurring). Justice Kennedy may well have intended this caveat to apply exclusively to cases where the *sole* ground asserted for the taking was economic development. He framed the issue by explaining his "agreement with the Court that a presumption of invalidity is not warranted for economic development takings in general, or for the particular takings at issue in this case." *Id.* at 493. In any case, Justice Kennedy has analogized the sort of heightened review he envisions to a more searching "rational-basis review under the Equal Protection Clause." *Id.* at 491 (citing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446-47 (rational basis case); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-36 (1973) (rational basis case)). None of the Equal Protection Clause cases Justice Kennedy relied upon involved deposing legislators or subpoenaing their confidential emails. Accordingly, even assuming, *arguendo*, we were to apply a version of Justice Kennedy's standard here, we would scrutinize objectively and find no "plausible" accusations of favoritism.

23

system. Furthermore, they have failed to allege any specific examples of illegality in the elaborate process by which the Project was approved, any specific illustration of improper dealings between Mr. Ratner and the pertinent government officials, or any specific defect in the Project that would be so egregious as to render it, on any fair reading of precedent, "palpably without reasonable foundation." *Midkiff*, 467 U.S. at 241.

This case has been very well litigated on both sides. At the end of the day, we are left with the distinct impression that the lawsuit is animated by concerns about the wisdom of the Atlantic Yards Project and its effect on the community. While we can well understand why the affected property owners would take this opportunity to air their complaints, such matters of policy are the province of the elected branches, not this Court.

## VII.

Finally, we must reject the due process and equal protection claims brought by the appellants for essentially the reasons stated by the district court. Accordingly, for the foregoing reasons, we hereby AFFIRM the judgment of the district court dismissing the federal claims with prejudice and the state claim without prejudice.

24